# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **LAURA HANSON**, | Case No. 3:21-cv-780-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **STATE OF OREGON, LEGISLATIVE ASSEMBLY**, | |
| Defendant. | |

Meredith A. Holley, LAW OFFICE OF MEREDITH HOLLEY, 207 E. Fifth Avenue, Suite 254, Eugene, OR 97401. Of Attorneys for Plaintiff.

Ellen F. Rosenblum, Attorney General; Marc Abrams, Assistant Attorney-in-Charge; and Jessica B. Spooner, Assistant Attorney General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Laura Hanson (Hanson) filed this action in Oregon state court against five

defendants: her former employer, the Legislative Assembly of the State of Oregon (the

Legislature); the Oregon Senate Committee on Conduct; State Senator Sara Gelser Blouin; State

Senator Floyd Prozanski; and State Senator Chuck Thomsen. Defendants removed the case, and

Hanson filed an amended complaint (Am. Compl.) against only the Legislature. ECF 32. Hanson

asserts the following claims: (1) three theories of disability discrimination under the federal

Americans with Disabilities Act (ADA); (2) four theories of disability discrimination under

Oregon state law; (3) disability retaliation under the ADA; (4) medical leave interference under

the Oregon Family Leave Act (OFLA); (5) medical leave interference under the federal Family

& Medical Leave Act (FMLA); (6) medical leave retaliation under OFLA; (7) medical leave

retaliation under the FMLA; (8) whistleblower retaliation under Oregon state law; and

(9) whistleblower retaliation by a public employer under Oregon state law. The Legislature has

moved for summary judgment against all claims. ECF 39. Hanson has cross-moved for partial

summary judgment on her FMLA and OFLA claims. ECF 41. For the reasons stated below, the

Court grants in part and denies in part the Legislature's motion for summary judgment and

denies Hanson's motion for partial summary judgment.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252,

255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (cleaned up); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

In December 2018, Oregon State Senator Sara Gelser Blouin (Gelser Blouin) hired Hanson as the Senator's Chief of Staff. ECF 50 at 1 (Hanson Decl. ¶ 1). In October 2019, Hanson sustained a concussion. ECF 40-1 at 32 (Hanson Dep. 58:8-13). From October 29 through November 5, 2019, Hanson took medical leave to recover. *Id.* at 38 (Hanson Dep. 65:12-15). By text message, Gelser Blouin encouraged Hanson to follow the directions of her doctors, which included avoiding work, especially looking at computer screens; Gelser Blouin also

instructed Hanson not to return to work until she was ready, explaining that it is important to allow the brain to recover properly. ECF 50-2 at 7-9.

During several months in the fall of 2019, Gelser Blouin discussed with the Legislature's Human Resources Director, Jessica Knieling (Knieling), concerns that Gelser Blouin had relating to Hanson's work performance. ECF 42-2 at 7-8 (Knieling 30(b)(6) Dep. 41:19-42:7). On December 10, 2019, Hanson told Gelser Blouin by text message that Hanson had been diagnosed with attention deficit hyperactivity disorder (ADHD). ECF 50-2 at 14. Hanson stated that she believed that seeing a psychiatrist and getting medication would reduce her work performance problems. *Id.* On the evening of December 17, 2019, Hanson emailed Gelser Blouin, stating that Hanson's therapist recommended she "take a mental health day soon." ECF 50-6. Hanson added, "the need [was] urgent." *Id.* She explained that she was thinking about taking her "mental health day" on December 20, 2019, to avoid leaving suddenly. *Id.*

The parties dispute what was said (both orally and in writing) between Hanson and Gelser Blouin about Hanson's "mental health day" needs. Because the parties' filed cross-motions, the Court recites each side's version of the story as relevant. Hanson contends that Gelser Blouin told Hanson on December 18th that "it would not be convenient" for Hanson to take her mental health day that week. ECF 50 at 3 (Hanson Decl. ¶ 10). According to Hanson, Gelser Blouin suggested waiting to take leave until the following week, when it would coincide with Gelser Blouin's scheduled time off and they could "close up the office." *Id.*

Gelser Blouin denies Hanson's version of this discussion. Gelser Blouin states that Hanson texted Gelser Blouin on December 18th to say that Hanson had a fever, but Gelser Blouin did not see that text message until the next day and did not respond to Hanson until December 19th. ECF 46 at 2 (Gelser Blouin Decl. ¶ 3). Gelser Blouin adds that she never denied

Hanson a requested sick day or time off and never told Hanson that her requested time off was "inconvenient." *Id.* (Gelser Blouin Decl. ¶ 4). Gelser Blouin states that she assigned Hanson only three small tasks that Gelser Blouin believed Hanson could easily complete in the two days before December 20th. *Id.* Gelser Blouin was out of the office during this period, leaving December 18th and not returning until January 2, 2020. ECF 40-3 at 4 (Gelser Blouin Dep. 100:18-25).

The record shows that in response to Hanson's written request on December 17th for a "mental health day" on December 20th, Gelser Blouin stated that the requested day off was "basically just a sick day and I think you have a lot of sick time. Just be sure it gets submitted so that neither of us get in trouble." ECF 50-6 at 2. In addition, the Legislature's outside investigator, Stoel Rives attorney Brenda Baumgart (Baumgart), concluded that the evidence did *not* support Hanson's contention that Gelser Blouin asked Hanson not to take her mental health day until the following week. ECF 40-6 at 29 (Baumgart Report ¶ 32).[1]

In the afternoon of December 18, 2019, Hanson emailed Gelser Blouin that Hanson would take her mental health day on December 20th "[a]s discussed." ECF 40-6 at 29-30 (Baumgart Report ¶ 32). Hanson reiterated this on the afternoon of December 19th, when she again emailed Gelser Blouin to say that Hanson planned to take her mental health day on December 20th but would "work for an hour or two in the morning or midday" and be available if needed. *Id.* at 30 (Baumgart Report ¶ 32); *see also* ECF 40-1 at 169.

The parties dispute whether Hanson in fact took a "mental health day" on December 20th. Hanson contends that she could not take that day off because Gelser Blouin had assigned her too much work to complete before the holidays. ECF 50 at 3 (Hanson Decl. ¶ 11). Gelser

---

[1] Baumgart's final report, issued July 2, 2020, is found at ECF 40-6 at 13-31.

Blouin asserts that she assigned three discrete tasks to Hanson several days before the planned mental health day and that these tasks should only have taken Hanson about fifteen minutes to complete. ECF 46 at 2 (Gelser Blouin Decl. ¶ 4). Hanson and Gelser Blouin exchanged several text messages on December 20th, some of which relate to Gelser Blouin's legislative work. ECF 43-5 at 1. December 20th is Gelser Blouin's birthday, and it is undisputed that in 2019 she spent that day away from the Capitol, touring juvenile facilities with her daughter. ECF 40-3 at 15-16 (Gelser Blouin Dep. 239:18-240:9).

Hanson returned to work on December 30, 2019. ECF 40-6 at 19 (Baumgart Report ¶ 4). Gelser Blouin was scheduled to be out of the office that day. *Id.* At 8:18AM, Gelser Blouin texted Hanson to notify her that a list of tasks was forthcoming. ECF 40-1 at 155. Gelser Blouin emailed the list to Hanson at about 8:40 a.m., which included notes about a town hall meeting on January 6, 2020. ECF 40-6 at 19 (Baumgart Report ¶ 4). Gelser Blouin texted Hanson at 9:09 a.m., asking whether Hanson was receiving Gelser Blouin's messages. *Id.*; ECF 40-1 at 156. Gelser Blouin then noticed errors in her calendar. She was particularly upset about the town hall meeting that Hanson previously had scheduled for January 6, 2020, but which had since been moved to a different date. ECF 40-1 at 156. After waiting for about an hour with no response from Hanson, Gelser Blouin emailed and spoke by telephone with Knieling to discuss these concerns about Hanson's work performance. ECF 40-6 at 19 (Baumgart Report ¶ 5).

Hanson responded to Gelser Blouin's text messages at 10:13 a.m. on December 30th. ECF 40-6 at 19 (Baumgart Report ¶ 6); ECF 40-1 at 156. During the ensuing text conversations, Gelser Blouin raised several issues about Hanson's work performance. ECF 40-1 at 156-58. Gelser Blouin explained that Hanson had entered the wrong date in Gelser Blouin's calendar for the upcoming town hall, causing Gelser Blouin to advertise an incorrect date for that event. *Id.*

at 157. The conversation escalated. Gelser Blouin told Hanson that "[t]here are so many consistent errors and that is not sustainable." *Id.* at 158. Hanson agreed that their working relationship was unsustainable and told Gelser Blouin that Hanson was looking for a new job. *Id.* Hanson also twice stated that Gelser Blouin had created "a toxic and emotionally abusive work environment" and that "no one can be successful within" such an environment. *Id*. at 158-59.

The Legislature had a policy at that time that was commonly referred to as "Rule 27." ECF 40-1 at 176-92.[2] Rule 27 is an administrative rule of the Oregon Legislature relating to the reporting and handling of claims of harassment, discrimination, and retaliation. The rule provides for mandatory reporting by any "appointing authority or a nonpartisan staff supervisor, including any member of the Legislative Assembly." *Id.* at 177. At 11:02 a.m. on December 30th, soon after the exchange of text messages between Gelser Blouin and Hanson, Gelser Blouin reported Hanson's recent text allegations to the Legislature's Human Resources department. ECF 42-1 at 24-25 (Gelser Blouin Dep. 215:16-216:3). Gelser Blouin specifically informed Knieling of Hanson's text message accusing Gelser Blouin of emotional abuse and workplace harassment. ECF 40-6 at 22 (Baumgart Rep. ¶ 9). As a supervisor and member of the Legislative Assembly, Gelser Blouin was a mandatory reporter under Rule 27. *See* ECF 40-4 at 2 (Knieling Dep. 29:8-20); ECF 40-1 at 177.

On December 31, 2019, Knieling called Hanson to say that Gelser Blouin had self-reported Hanson's accusations of abusive workplace behavior. ECF 43-7 at 3-4. Knieling also explained that there would be a Rule 27 investigation of Gelser Blouin's alleged harassment conducted by an outside investigator (Baumgart). *See id.* at 2-3; ECF 40-1 at 57 (Hanson

---

[2] Legislative Branch Personnel Rule 27, H.R. Con. Res. 20, 80th Leg. Assembly (Or. 2019). Rule 27 was amended on August 10, 2020. *See* ECF 40-1 at 193-208 (Legislative Branch Personnel Rule 27, H.R. Con. Res. 221, 80th Leg. Assembly (Or. 2020)).

Dep. 123:4-9). Knieling told Hanson that under Rule 27, the investigation would be public

record, although the Legislature would keep Hanson's information as confidential as possible.

ECF 43-7 at 2. Hanson and Knieling also discussed Hanson's rights regarding medical leave and

disability accommodation. *Id.*

Hanson emailed Knieling later that day to summarize Hanson's understanding of their

recent telephone conversation. ECF 43-7 at 3-4. On January 2, 2020, after reviewing notes that

she had taken during her phone call with Hanson, Knieling emailed her response to Hanson's

December 31st email, providing Knieling's own understanding of the December 31st telephone

conversation. ECF 43-7 at 2-3. Later on January 2nd, Hanson emailed her reply to Knieling.

ECF 43-7 at 1. Hanson said that she would comply with the Rule 27 investigation even though

she did not want it to go forward. *Id.* In her email, Hanson explained that she believed Gelser

Blouin had retaliated against Hanson for taking protected medical leave for her concussion and

attempting to take leave for a mental health day. *Id.* Hanson stated she would not elaborate on

this issue further at this time because Knieling had said that an outside investigator (Baumgart)

would be handling the investigation. *Id.*

On January 5, 2020, Gelser Blouin and Knieling asked Hanson to meet on January 6th to

discuss work assignments moving forward. ECF 50-10 at 1-3. Knieling stated that the meeting

had nothing to do with Baumgart's investigation. *Id.* At the meeting, Gelser Blouin and Knieling

told Hanson that she was being placed on paid administrative leave that day, also called "home

duty station,"[3] and that she had to turn in her work phone and computer. ECF 50 at 4 (Hanson

Decl. ¶ 14); ECF 40-1 at 70 (Hanson Dep. 143:4-13). Knieling then gave Hanson a memo

---

[3] For purposes of the pending motions, the Court finds no meaningful difference between the terms "home duty station" and "paid administrative leave" and thus uses the more common term, "paid administrative leave."

explaining that Hanson could not enter the State Capitol building during her period of administrative leave. ECF 40-1 at 209-10. Hanson was given several hours to gather any materials she might need for the Rule 27 process. ECF 50 at 4 (Hanson Decl. ¶ 14). Before she left her office, Hanson forwarded some emails from Gelser Blouin's email account to Hanson's personal email account and then deleted the forwarded emails from Gelser Blouin's "sent box," or "outbox." *Id*. Hanson also provided a certification from her therapist for her previous medical leave. *Id.* at 3, 4 (Hanson Decl. ¶¶ 9, 15); ECF 50-7.

Hanson met with Baumgart several times during the following months. *See* ECF 50 at 5 (Hanson Decl. ¶¶ 17, 20). Although these interviews were voluntary, Hanson states that she felt pressured to speak with Baumgart so that the investigation did not proceed without Hanson's input. ECF 40-1 at 74-75 (Hanson Dep. 151:13-152:5). Hanson adds that she felt that these interviews were stressful, the Rule 27 process triggered suicidal ideation, she wanted the process to stop but Baumgart said it could not, and Hanson told Baumgart she was experiencing suicidal thinking. ECF 50 at 5-6 (Hanson Decl. ¶¶ 17, 20). Hanson also contends that Baumgart implied that Hanson would be fired if she did not participate in these interviews and that mental health issues are not considered a disability. ECF 40-1 at 75 (Hanson Dep. 152:6-25). Defendant contests that Baumgart made these statements.

Before the Rule 27 investigation began, Hanson asked that it not occur or, at least, that it be kept confidential, and she made similar requests during the investigation. *See* ECF 50 at 5 (Hanson Decl. ¶ 17); ECF 43-7 at 2. To accommodate Hanson's request for confidentiality, Baumgart redacted Hanson's name from the final report. ECF 40-6 at 32-50. Hanson, however, was Gelser Blouin's only employee for at least some of the dates covered by that report. ECF 50 at 6 (Hanson Decl. ¶ 21).

Hanson states that several weeks into her administrative leave she learned that there was a workplace rumor circulating that her administrative leave resulted from a sexual assault claim. ECF 50 at 4-5 (Hanson Decl. ¶ 16). By email, Hanson asked Knieling to tell other employees that Hanson was on "medical leave," but Knieling responded that she could not do so. ECF 50-12 at 1-2.

On February 7, 2020, Hanson met with a news reporter from Oregon Public Broadcasting (OPB), Dirk VanderHart (VanderHart). ECF 40-1 at 77-78 (Hanson Dep. 162:5-13, 163:9-14). Hanson gave VanderHart copies of text messages from Gelser Blouin that Hanson believed were evidence of legal violations or government mismanagement. ECF 50 at 5 (Hanson Decl. ¶ 18). VanderHart then contacted other employees at the Capitol to discuss the Rule 27 investigation. ECF 40-3 at 7 (Gelser Blouin Dep. 130:9-17).

The Legislature provided Hanson with both a draft of Baumgart's report and a copy of the final report. The Legislature also told Hanson of the timeline for scheduling a public hearing, which under Rule 27 had to be set within 14 days from the date after the outside investigator provided her final report. ECF 49-7 at 5-6. Under the rule, Hanson had a right to comment on both the draft and final reports and to attend the public hearing. Hanson requested extensions of time both to submit her comments and to extend the date of the hearing. *Id.* at 3-5. The Legislature denied Hanson's requests because of the strict timelines established in Rule 27 and notified Hanson and her attorney of the public hearing date of July 15, 2020. *Id.* at 1-2. Hanson again asked for a postponement of the hearing because she felt unwell, which the Legislature denied. *See* ECF 49-7 at 1-2; ECF 40-1 at 84-85 (Hanson Dep. 188:6-20, 189:7-15). Hanson attended the hearing remotely. ECF 40-1 at 84 (Hanson Dep. 188:6-20).

In her final report, Baumgart concluded that: (1) Hanson's report that Gelser Blouin had created a toxic and abusive work environment fell outside the scope of Rule 27[4]; (2) Hanson's request to take a "mental health day" in December 2019 did not qualify as protected leave; (3) there was no substantiated evidence of discriminatory or retaliatory motive by Gelser Blouin; and (4) there was no substantiated evidence that Gelser Blouin interfered with or acted in a discriminatory or retaliatory manner toward Hanson in relation for her use of or attempts to use protected medical leave. *See* ECF 40-6 at 32-50.

Hanson stated that she had additional documents to submit for review by the Senate Conduct Committee. ECF 49-4 at 71-72 (Baumgart Report addendum). Because of Hanson's representations and additional submissions, the Legislature scheduled a second public hearing for October 7, 2020. ECF 40-1 at 93 (Hanson Dep. 200:5-22). Baumgart submitted an addendum to her report. ECF 49-4 at 71-75. Although Hanson's submissions did not affect Baumgart's findings, an additional submission was presented by the Legislature of a "received January 2020" medical certification from Hanson's doctor, retroactively seeking to certify Hanson's December 2019 leave as protected. ECF 49-4 at 72. Baumgart then amended her findings to conclude that even if Hanson's December 20, 2019 absence *did* qualify as protected leave, this fact would not change Baumgart's conclusion that Gelser Blouin did not interfere with or retaliate against Hanson with respect to that leave. *Id.* at 72-73. Hanson remained on paid administrative leave for ten months throughout this process, and she was required to be available to the Legislature during regular work hours but was not assigned any tasks.

---

[4] A Rule 27 investigator has the discretion to recommend training or take other steps to solve issues that do not fall within the scope of Rule 27. In her report, Baumgart did not recommend that the Legislature take any steps with respect to Hanson's complaint because Baumgart found that the record did not substantiate Hanson's allegation of inappropriate workplace conduct by Gelser Blouin.

On October 7, 2020, the Senate Conduct Committee decided that Hanson's
December 20th leave was protected by state and federal law. ECF 40-5 at 12 (Prozanski
Dep. 87:4-12). The Conduct Committee also decided that Gelser Blouin had not violated Rule 27
by engaging in inappropriate workplace conduct against Hanson based on any protected
characteristic. *Id.* Gelser Blouin terminated Hanson's employment that same day. ECF 40-1 at 95
(Hanson Dep. 202:23-25). On December 29, 2020, Hanson filed a complaint with the Oregon
Bureau of Labor and Industries (BOLI) and the Equal Employment Opportunity Commission
(EEOC). Hanson received a right-to-sue letter on April 21, 2021. This lawsuit followed.

## DISCUSSION

### A.  Americans with Disabilities Act & State Disability Claims

Hanson's first, second, and third claims allege several theories of disability
discrimination under the ADA[5] and the Oregon Rehabilitation Act.[6] The Court analyzes these
federal and state claims together under the standards governing the ADA because the state statute
"shall be construed to the extent possible in a manner that is consistent with any similar
provisions of the federal Americans with Disabilities Act of 1990 . . . and as otherwise
amended." ORS § 659A.139; *see also Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080,
1087 (9th Cir. 2001) ("The standard for establishing a prima facie case of [disability]
discrimination under Oregon law is identical to that used in federal law."). Hanson argues that
the Legislature discriminated and retaliated against her for attempting to take disability leave,
failed to accommodate her disabilities, and implemented a policy that disparately impacts
employees with mental health disabilities.

---

[5] 42 U.S.C. § 12101 *et seq.*

[6] Or. Rev. Stat. (ORS) § 659A *et seq.*

### 1.  Discrimination

The ADA prohibits an employer from treating an otherwise capable employee adversely because he or she is disabled. To establish a prima facie case of disability discrimination, Hanson must show "(1) that she is disabled within the meaning of the ADA; (2) that she is a qualified individual with a disability; and (3) that she was discriminated against because of her disability." *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013). An individual is qualified if "with or without reasonable accommodation, [she] can perform the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8). "The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Schechner v. KPIX-TV*, 686 F.3d 1018, 1022 (9th Cir. 2012) (alteration in original) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

If Hanson establishes her prima facie case, the burden shifts to the Legislature to offer a legitimate, nondiscriminatory reason for the alleged adverse employment action. *See Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (ADA discrimination claims are subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). If the Legislature does so, the burden shifts back to Hanson to "prove that the reason given by the employer was pretextual." *Id.*

The Legislature argues that Hanson cannot make a prima facie case of discrimination for any of her claims. The Legislature asserts that two of Hanson's claimed adverse employment actions do not qualify as such and that Hanson cannot show the requisite causal link—that she suffered an adverse employment action because of her disability. Although not specifically argued in the section relating to discrimination, the Legislature also argues that Gelser Blouin's reasons for terminating Hanson were legitimate and not pretextual.

### a. Adverse Employment Actions

An adverse employment action "is one that materially affects the terms, conditions, or privileges of the plaintiff's employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (cleaned up). "Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (analyzing "adverse employment action" for purposes of retaliation under Title VII of the Civil Rights Act of 1964). "[B]admouthing an employee outside the job reference context" and "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Id.* at 929.

### i. Paid administrative leave

Hanson's first alleged adverse employment action is that the Legislature put Hanson on paid administrative leave during the Rule 27 investigation. The Legislature argues that administrative leave *with pay* is not an adverse employment action as a matter of law. The Legislature cites out-of-circuit authority for this proposition. These nonbinding cases do not persuade the Court that an unwanted period of administrative leave during a *ten-month* investigation of *someone else's* potential misconduct cannot be adverse just because the employee received a regular paycheck.

In *Solomon v. Philadelphia Newspaper, Inc.*, an employer put the plaintiff on paid administrative leave for nine days while the employer investigated whether the plaintiff brought his handgun onto work premises. 2008 WL 2221856, at *6 (E.D. Penn. May 21, 2008). The court considered cases holding that "a suspension with pay pending a *prompt investigation* into *allegations of wrong-doing* does not constitute an adverse employment action" and agreed that under the pending circumstances, the plaintiff's attempt to assert an adverse action was

unavailing. *Id.* at *17-18 (emphasis added). In *Breaux v. City of Garland*, a police officer was placed on paid leave for less than three months during an investigation into whether the officer lied or violated police policies in making allegations of corruption. 205 F.3d 150, 154-55 (5th Cir. 2000). The officer was returned to a position similar to his pre-leave position. *Id.* at 158. Thus, the Fifth Circuit concluded that the officer did not suffer an adverse employment action. *Id.* The situation was similar in *Singletary v. Missouri Department of Corrections*, where the plaintiff was suspended with pay and benefits for 89 days during an investigation into his purported misconduct, then "promptly" reinstated. 423 F.3d 886, 889, 891 (8th Cir. 2005). The Eighth Circuit agreed with the reasoning of other circuits that placing an employee on paid administrative leave during an investigation, particularly "short administrative leave with pay to allow time for internal investigation of complaint," did not rise to the level of an adverse employment action. *Id.* at 892 (citing *Breaux* and *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001)); *see also Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("We have held that a suspension *with* pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action." (emphasis in original) (quotation marks omitted) (also citing *Breaux*)).

The cases cited by the Legislature are distinguishable in several ways. First, the Legislature's Rule 27 process took far longer than the investigations that triggered administrative leaves in the cases cited by the Legislature—the Rule 27 investigation spanned nearly a year. Second, and critically, the Rule 27 investigation looked into Gelser Blouin's conduct rather than Hanson's. Hanson was not the subject of the Rule 27 investigation, despite her prominence in its findings. Third, Hanson was not reinstated to her pre-leave position. Instead, she was put on paid administrative leave for ten months while an investigation examined her supervisor's alleged

wrongdoing, then promptly fired the same day that the investigation concluded. Finally, the cited circuit cases all rely on *Breaux*, in which the Fifth Circuit emphasized its "narrow view of what constitutes an adverse employment action." 205 F.3d at 157. The Ninth Circuit, however, expressly rejected the Fifth Circuit's narrow view on adverse employment actions and instead adopted "an expansive view of the type of actions that can be considered adverse employment actions." *Ray v. Henderson*, 217 F.3d 1234, 1241-43 (9th Cir. 2000).

For all these reasons, the mere fact that the Legislature continued to pay Hanson throughout her lengthy administrative leave does not preclude a factfinder from considering whether this employment action rises to the level of an adverse employment action under state and federal law. *Cf. Zayed v. Apple Computers*, 2006 WL 889571, at *8 (N.D. Cal. Apr. 5, 2006) ("Whether Zayed's treatment may be perceived as amounting to a change in her level of responsibility and whether it constitutes an adverse employment action are issues that should be decided by a jury."). Viewing the evidence in the light most favorable to Hanson, the Court finds that a jury could reasonably conclude that Hanson's administrative leave, although paid, was an adverse employment action.

### ii.  Public hearings

Hanson next alleges that public hearings held by the Legislature on July 15 and October 7, 2020, as part of its Rule 27 investigation, were adverse employment actions. She argues that the hearings were adverse because they publicly disclosed her work performance and medical conditions when she was not accused of any wrongdoing. Hanson contends that her work performance issues resulted from her need for accommodation and that a reasonable jury could conclude that the public hearings were, at least in part, held because of Hanson's disabilities.

The problem with Hanson's argument is that she does not offer any evidence or argument of how the public hearings materially affected the terms, conditions, or privileges of Hanson's employment. First, the hearings were not about her work performance issues but were about whether she was subject to discrimination or retaliation for taking protected leave. Second, even assuming that airing Hanson's work performance issues in public hearings could be characterized as "bad mouthing" or negative disclosure, Hanson does not distinguish the Ninth Circuit's cases holding that "bad mouthing" an employee outside of the job reference context is not actionable. Nor does Hanson offer any evidence that the hearings have affected her ability to find other employment.

For supporting authority, Hanson relies only on the Ninth Circuit's citation in *Ray* to a D.C. Circuit case in which the employer's cancellation of a "public event honoring an employee" was found to be an adverse employment action. *Ray*, 217 F.3d at 1242 (citing *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 330-31 (D.C. Cir. 1991)). In *Passer*, the defendant canceled with one day's notice a symposium celebrating the plaintiff, for which nearly a dozen presenters and several thousand attendees had been expected. 935 F.2d at 325. The symposium was "one of the highest honors that could have been bestowed upon [the plaintiff] by his peers." *Id.* The D.C. Circuit accepted the plaintiff's allegations that this cancellation publicly humiliated him and had the effect of "scuttl[ing] a former employee's search for a new job," and therefore found it to be an adverse employment action. *Id.* at 331.

Hanson asserts that based on *Ray's* reasoning, "it must then be within the purview of the jury to determine whether holding public hearings about an employee's medical conditions is an adverse action." The Court is unpersuaded that *Ray's* cite to *Passer* should be so construed. First, the Ninth Circuit in *Ray* included *Passer* as a general example of the expansive view the court

was adopting, not for any specific legal proposition. *Ray*, 217 F.3d at 1241-42. Second, *Passer* is distinguishable on several grounds. The Legislature conducted a mandatory investigation of Gelser Blouin under Rule 27, triggered by Gelser Blouin's disclosure of Hanson's complaints. The Legislature did not exercise discretion in doing so, unlike the defendant in *Passer*. And, unlike the plaintiff in *Passer*, Hanson was not the target of this investigation; her alleged abuser was. Additionally, Hanson has offered no direct or circumstantial evidence that her "search for a new job" has been harmed by any disclosures made in the hearings.

The Court also notes that Hanson's participation was not mandatory—including her participation in the public hearings. The Legislature also redacted Hanson's name from the Baumgart report. The mere fact that the Rule 27 process took place and that it requires public hearings to maintain transparency in governance is not an adequate basis to assert an adverse employment action. Hanson offers no evidence that the hearings materially affected the terms or conditions of her employment or affected her future job prospects. Thus, the Court grants the Legislature's motion for summary judgment that holding public hearings as mandated by Rule 27 is not an adverse employment action.

### iii. Termination of Employment

Finally, Hanson alleges that the termination of her employment was an adverse employment action. The Legislature does not dispute that termination of employment can be an adverse employment action.

## b. Causation

To establish a prima facie case of disability discrimination, Hanson must show a causal link between the two remaining adverse employment actions and her disability. In other words, Hanson must prove "that the adverse employment action would not have occurred *but for* the disability." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) (emphasis added).

### i.  Paid administrative leave

Hanson argues that she would not have been placed on paid administrative leave had she not tried to take disability leave in late December 2019. She also contends that the Rule 27 investigation would not have happened but for her email to Knieling claiming that she had experienced medical leave interference and retaliation. The Legislature responds that nothing in the record supports these assertions and that Hanson was put on paid leave to resolve her unrelated accusations that Gelser Blouin had created a "toxic and abusive" work environment.

The issue of what *triggered* the Rule 27 investigation as opposed to what the investigation later focused on at some point after Hanson's January 2, 2020 email are two different factual questions. The evidence is clear that what initiated the Rule 27 investigation was Hanson's December 30, 2019 text to Gelser Blouin, in which Hanson accused Gelser Blouin of creating a toxic and abusive work environment. The next day, December 31, 2019, Hanson and Knieling had a telephone call in which Knieling informed Hanson that based on her text, the Legislature was initiating an investigation, to be conducted by Baumgart. This conversation occurred before Hanson raised her concern about FMLA or OFLA retaliation. That same day, Hanson emailed Knieling a summary of their December 31st telephone call. In this email, Hanson confirms her understanding that Human Resources was "required to look into this matter because Senator Gelser forwarded you the text I sent her yesterday" that mentioned the purported "toxicity of my workplace." Hanson further confirms her understanding that "because of the serious accusations (emotional abuse and toxic work environment) in the text message," Human Resources must investigate the matter, regardless of Hanson's "intention in sending [the text] to the senator directly." Knieling responded to this email on January 2, 2020, giving her own summary of the telephone call. Later that day, Hanson replied to Knieling's email, only then raising concerns that, upon reflection, Hanson had experienced FMLA and OFLA retaliation.

Additionally, Hanson's January 2nd email raising protected leave retaliation specifically discusses the investigation and the fact that it had already been triggered. Hanson reports in this email that she understands she is "legally obligated to comply with the investigation," although Hanson did not wish or realize her "text to the senator would prompt one [an investigation]." Thus, the December 31st through January 2nd email exchange between Knieling and Hanson shows that both individuals understood that an investigation had already been triggered by Hanson's text, which reported a toxic and abusive work environment, *before* Hanson sent her January 2, 2020 that asserted concerns about possible OFLA and FMLA retaliation.

Additional evidence supports this conclusion. Hanson testified at deposition, confirming her recollection that on the December 31, 2019 telephone call Knieling told Hanson that there would be an investigation regardless of whether Hanson wanted one. Knieling also took handwritten notes memorializing the December 31, 2019 telephone call, and these notes are consistent with this conclusion. The Court finds no genuine dispute of material fact regarding what *triggered* the Rule 27 investigation.

Only after Hanson reported on January 2, 2020 that she believed she had suffered retaliation for taking and attempting to take protected leave was that subject added to the investigation. Indeed, it ultimately became the only topic evaluated by the Senate Conduct Committee because Baumgart concluded that the "toxic and abusive" work environment accusation fell outside the rubric of Rule 27. Both Gelser Blouin and Knieling testified about the shift in focus of the Rule 27 investigation. *See, e.g.*, ECF 42-1 at 23-25 (Gelser Blouin Dep. 214:17-216:12) (explaining the "weird quirk" that the Conduct Committee convened not because of the accusation about a toxic work environment but because of the later allegation Hanson made "upon thinking about it" that she had suffered interference or retaliation with

protected leave and that Gelser Blouin did not know about that allegation until hearing from
VanderHart); ECF 42-3 at 18 (Knieling Dep. 167:9-18) (testifying that it is her understanding
that the investigation went forward because Hanson had made an allegation of leave retaliation).
Baumgart's Final Report reflects that she concluded that the "toxic and abusive" work
environment accusation did not fall within Rule 27. What is unclear, however, is *when* the
investigation switched focus away from the work environment accusation to the protected leave
accusation. For purposes of summary judgment, however, it is a reasonable inference that it was
before Hanson was placed on administrative leave.

Additionally, Nathan Monson—the Legislature's Equity Officer for a brief period—states
in his declaration that Knieling told him to "just put them on administrative leave," referring to
harassment and discrimination complainants, whom he says she repeatedly described as "crazy"
for, according to Monson, "enforcing their rights." The administrative leave policy appeared to
him to be "a process of getting rid of employees [Knieling] saw as a problem." This evidence
creates an issue of fact about the Legislature's reasons for placing Hanson on paid administrative
leave on January 6, 2020.

The Court finds *Magee v. Trader Joe's Co.,* 2020 WL 9550008 (D. Or. Sept. 1, 2020), to
be analogous. In that case, a U.S. Magistrate Judge recommended that the paid administrative
leave in that dispute be found to be an adverse employment action caused by disability
discrimination. *Id.* at *11-12. The judge focused on the five-week temporal proximity between
the accommodation request and the imposition of the administrative leave and explained that "[a]
reasonable employee being immediately placed on unpaid leave for a period of three weeks after
seeking accommodations could be dissuaded from seeking accommodations." *Id.* The judge
concluded:

> Viewing the evidence in the light most favorable to Magee, the court finds that Magee has demonstrated a genuine issue of material fact that but for her accommodation request, she would not have been placed involuntarily on unpaid leave. Trader Joe's immediately placed Magee on unpaid leave after receiving her request and was concerned about other employees seeking a similar request if it granted her request. A reasonable jury could conclude that Trader Joe's was reluctant to grant Magee's accommodation request and placed her immediately on unpaid leave to discourage not only her, but also other employees, from making similar requests

*Id.* at *12. United States Chief District Judge Hernandez adopted this portion of the findings and recommendation and found triable issues on two additional adverse employment actions. *Magee v. Trader Joe's Co.*, 2021 WL 1550336, at *1-2 (D. Or. Apr. 20, 2021).

Similarly, here, the evidence viewed in the light most favorable to Hanson could persuade a reasonable jury that the Legislature would not have placed Hanson on leave but for her requested disability accommodation of taking a "mental health" day on or around December 20, 2019. Hanson was placed on administrative leave less than three weeks after she requested her mental health day, and there is evidence that Legislative staff were instructed to use administrative leave as a weapon against persons who enforced their rights or were considered a problem. Hanson has met her minimal burden of showing a prima facie case.

### ii.  Termination of Employment

Regarding the termination of Hanson's employment in the context of her disability discrimination claim, the parties both cite cases addressing *retaliation* claims and argue whether temporal proximity sufficiently shows causation for Hanson's disability *discrimination* claims. "Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of *retaliation* in some cases." *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865 (9th Cir. 2003) (emphasis added). Courts in analyzing *discrimination* claims, however, also have considered close temporal proximity as evidence supporting whether

discrimination was "because of" (meaning "but for") the protected characteristic, particularly in ADA and FMLA cases. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (concluding that two-month temporal proximity between employer learning of pregnancy and termination of employment can support inference of nexus between pregnancy and employment termination); *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1129 (C.D. Cal. 2007) (finding that temporal proximity between date employer learned of pregnancy and adverse employment actions suggested discriminatory motive); *cf. Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137 (9th Cir. 2003) (concluding in an FMLA interference claim that "the proximity in time between the leave and [plaintiff's] termination also provides supporting evidence of a connection between the two events").

Applying the "but for" test to the evidence viewed in the light most favorable to Hanson, the Court finds that a reasonable jury could conclude that Gelser Blouin fired Hanson because of Hanson's disabilities. Gelser Blouin's letter terminating Hanson's employment mentions problems with Hanson's work performance that are similar to Hanson's symptoms of ADHD. In addition, Gelser Blouin fired Hanson the same day that the Rule 27 process cleared Gelser Blouin of any allegations of wrongdoing. A jury may reasonably infer from these circumstances that Gelser Blouin wanted to fire Hanson because of Hanson's disabilities, was constrained from doing so by the investigation, then did so the moment the investigation ended. It is a question for the jury whether this adverse employment action occurred because of Hanson's disabilities and whether Gelser Blouin was motivated by discriminatory animus when she fired Hanson. Thus, Hanson has provided enough evidence to raise a prima facie case of disability discrimination under the ADA and Oregon law.

### c. Legitimate Reason and Pretext

The Legislature argues that Gelser Blouin had legitimate reasons for terminating

Hanson's employment and for placing Hanson on paid administrative leave "The defendant need

not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if

the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the

plaintiff." *Felton v. Trs. of Cal. State Univs. & Colls.*, 708 F.2d 1507, 1508-09 (9th Cir. 1983)

(quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254-56 (1981)). The Court finds that

the Legislature has met its burden of production.

Regarding pretext, although a plaintiff's burden is higher to show pretext than to prove a

prima facie case, "[t]he same evidence can be used to establish a prima facie case *and* to create a

genuine issue regarding whether the employer's explanations are pretextual." *Strother v. S. Cal.*

*Permanente Med. Grp.*, 79 F.3d 859, 870 (9th Cir. 1996) (emphasis in original); *see also*

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (explaining that plaintiffs

"may rely on the same evidence they used to establish a prima facie case or put forth additional

evidence"); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732 (9th Cir. 1986) ("To show pretext,

the plaintiff is not necessarily required to introduce evidence beyond that already offered to

establish her prima facie case, although she may of course provide additional proof of the

defendants' unlawful motivation."). The Court finds that Hanson has satisfied her burden of

showing that the Legislature's stated reasons may be pretext on the evidence presented. "[T]he

plaintiff in an employment discrimination action need produce very little evidence in order to

overcome an employer's motion for summary judgment. This is because the ultimate question is

one that can only be resolved through a searching inquiry—one that is most appropriately

conducted by a factfinder, upon a full record." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225

F.3d 1115, 1124 (9th Cir. 2000) (quotation marks omitted).

#### d.  Conclusion

The Court denies the Legislature's motion for summary judgment against Hanson's claimed adverse employment discrimination claims based on her being placed on paid administrative leave and the termination of her employment. The Court, however, grants the Legislature's motion against Hanson's discrimination claims based on the claimed adverse employment action of the public hearings and other aspects of the Rule 27 process and investigation.

### 2.  Retaliation

Hanson alleges that the Legislature retaliated against her for reporting that Gelser Blouin interfered with Hanson's rights as an employee under the ADA and ORS § 659A.109. The Legislature argues that Gelser Blouin terminated Hanson for legitimate reasons unrelated to her medical leave. The Legislature does not address the other grounds on which Hanson bases her retaliation claims, besides repeating that her paid administrative leave and the Rule 27 hearings were not adverse employment actions.

The Court need not reach the merits of the Legislature's motion against Hanson's retaliation claims. Hanson brings her ADA claim under Title I. In *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261 (9th Cir. 2009), the Ninth Circuit analyzed retaliation claims against an employer under Title I, with the remedies available under 42 U.S.C. § 12117 (the remedy clause for Title I). The Ninth Circuit held that Title I ADA retaliation claims "are redressable only by equitable relief" and thus that "no jury trial is available." *Id.* at 1269-70.[7] The Supreme Court has

---

[7] The Court notes, however, that a plaintiff also must have standing to assert any appropriate equitable relief. *See Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1036-37 (9th Cir. 2006) (rejecting that a former employee had standing to seek equitable relief such as requiring anti-discriminatory policies).

addressed claims under Title II of the ADA (and its remedy clause, 42 U.S.C. § 12133),

concluding that although money damages are available under those provisions, punitive damages

are not. *Barnes v. Gorman*, 536 U.S. 181, 185, 188 (2002). The Ninth Circuit, however, has held

that "Congress did not intend for Title II to apply to employment" because "[o]btaining or

retaining a job is not the receipt of services, nor is employment a program or activity provided by

a public entity." *Zimmerman v. Or. Dep't of Just.*, 170 F.3d 1169, 1176 (9th Cir. 1999) (cleaned

up). Thus, Hanson's retaliation claim is governed by *Alvarado*, and she may not seek money

damages and is not entitled to a jury trial for this claim.

Hanson requests only compensatory money damages as relief for her retaliation claims

under the ADA and Oregon law. This relief is unavailable to Hanson under Ninth Circuit

precedent. Although neither party raised this issue, a court may dismiss claims sua sponte for

failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Omar v.

Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987). The Court dismisses Hanson's ADA

retaliation claims because she seeks only money damages.

### 3.  Failure to Accommodate

Hanson alleges that the Legislature failed to accommodate her disabilities, thereby

violating both the ADA and ORS § 659A.112. The Legislature argues that it reasonably

accommodated Hanson's disabilities when requested. Hanson responds that there are factual

disputes that preclude summary judgment.

### a.  Legal Standards

The ADA prohibits an employer from failing to make a reasonable accommodation for

the known disability of a qualified individual. 42 U.S.C. §12112(b)(5)(A). To establish a prima

facie case for failure to accommodate under the ADA, Hanson must show that (1) she is a

qualified individual, (2) the Legislature received adequate notice of her desire for a reasonable

accommodation, and (3) a reasonable accommodation was available that would have enabled

Hanson to perform the essential functions of her job. *See* 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R.

§§ 1630.2(o)(1), 1630.9(d); *see also Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th

Cir. 2018).

     "Once an employer becomes aware of the need for accommodation, that employer has a

mandatory obligation under the ADA to engage in an interactive process with the employee to

identify and implement appropriate reasonable accommodations." *Humphrey v. Mem. Hosp's*

*Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). "The interactive process requires communication

and good-faith exploration of possible accommodations between employers and individual

employees, and neither side can delay or obstruct the process." *Id.* There is no "particular

language" required to activate this duty but the employee must "inform the employer of the need

for an adjustment due to a medical condition." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080,

1089 (9th Cir. 2002) (quoting *Barnett v. U.S. Air*, 228 F.3d 1105, 1112 (9th Cir. 2000), *vacated*

*on other grounds*, 535 U.S. 391 (2002)).

     An appropriate reasonable accommodation is one that effectively enables an employee to

"perform the duties of the position." *Humphrey*, 239 F.3d at 1137 (quoting *Barnett*, 228 F.3d

at 1115). In other words, it must "enable [the employee] to perform the essential functions of an

available job." *Dark v. Curry Cnty.*, 451 F.3d 1078, 1088 (9th Cir. 2006). Examples of

reasonable accommodations include "job restructuring, part-time or modified work schedules,

[and] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). An employer may, however,

raise the affirmative defense that the requested accommodation creates an undue hardship. *See*

*id.* § 12112(b)(5)(A) (requiring reasonable accommodation "unless such covered entity can

demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity"); *see also Snapp*, 889 F.3d at 1095.

Finally, at trial the employee has the burden of showing the existence of a reasonable accommodation. *Dark*, 451 F.3d at 1088. "To avoid summary judgment, however, [she] 'need only show that an "accommodation" *seems reasonable on its face*, i.e., ordinarily or in the run of cases.'" *Id.* (quoting *Barnett*, 535 U.S. at 401-02) (emphasis added in *Dark*).

### b.  Analysis

Hanson alleges in her Amended Complaint that there were seven times when the Legislature failed to accommodate her disabilities: (1) her request for time off in late December 2019 for a "mental health" day; (2) her administrative leave placement on January 6, 2020; (3) the Legislature's Rule 27 investigation; (4) the fixed deadline for responding to Baumgart's report; (5) the inflexible timing of the public hearing on June 15, 2020; (6) the subjects discussed during the two public Rule 27 hearings; and (7) the termination of Hanson's employment. In responding to the Legislature's motion for summary judgment, however, Hanson states that she requested an accommodation when she asked for time off in December 2019, then argues generally that there are issues of fact as to whether the Legislature violated her rights regarding her request for time off, her paid leave status, and the Rule 27 investigation.

### i.  Mental Health Day

The Legislature argues that Hanson has not presented evidence showing that Hanson's request for a mental health day on December 20, 2019, was a request for an ADA disability accommodation. Rather, the Legislature asserts, Hanson merely informed Gelser Blouin about "here's what's happening and here's what I need," and that such a statement is not enough to trigger the Legislature's duty to engage in an interactive process. The Legislature also argues that

even if Hanson had requested a reasonable accommodation, Gelser Blouin satisfied that request by giving Hanson the day off.

Hanson responds that Gelser Blouin knew or should have known that Hanson regularly requested the flexibility to take a mental health day, "the ability to step away from the office when bad things happened," as a disability accommodation. At oral argument, Hanson clarified that the accommodation she requested was to take off work on or around December 20, 2019. Hanson also asserts that she could not take her mental health day as she requested because Gelser Blouin assigned Hanson too much work.

The Court finds that Hanson's request for time off was sufficient to raise an issue of fact for the jury regarding notice. Factual disputes also exist as to whether Gelser Blouin provided reasonable accommodation or whether she assigned work that rendered illusory the requested day off. Thus, the Court denies summary judgment on this claim for failure to accommodate.

### ii.  Paid Leave and the Rule 27 Investigation

The Court next examines Hanson's failure to accommodate claim stemming from the Rule 27 investigation. Hanson asserts that the Legislature failed to engage in an interactive process with her to accommodate her disabilities during various steps of the investigation. Regarding the Legislature's placement of Hanson on paid administrative leave, she does not identify what reasonable accommodation was needed or in what manner she identified to the Legislature her need for an accommodation. Hanson must inform the Legislature of her need for an accommodation to trigger the obligation to participate in an interactive process. *Zivkovic*, 302 F.3d at 1089. Thus, summary judgment is granted on this ground. *See, e.g.*, *Wozab v. Flextronics Am., LLC*, 2012 WL 4498232, at *4 (D. Nev. Sept. 28, 2012) (dismissing failure to accommodate claim because the "plaintiff has not adequately alleged how the requested

accommodations may have been reasonable, to whom the purported requests were made, and why the accommodations were necessary for plaintiff to perform his job").

For the Rule 27 investigation process and public hearings, Hanson fails to present argument or evidence that any of the requested accommodations were necessary for Hanson to perform any essential function of her job. "The term essential function means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). A function may be essential if "the reason the position exists is to perform that function," there are a limited number of employees amongst whom the job function can be distributed, or the function is "highly specialized" and the person in the position was hired for expertise or ability in that function. *Id.* § 1630.2(n)(2). Thus, summary judgment is granted against all of the alleged accommodations relating to the Rule 27 investigation.

### iii. Termination of Employment

Finally, Hanson alleges that the termination of her employment was a failure to accommodate her disabilities. Hanson provides no argument in her brief for how her employment termination, by itself, was a failure to accommodate. The loss of her job may have been an adverse employment action, but that does not make it a failure to accommodate. Hanson does not assert what accommodation she requested or what reasonable accommodation the Legislature should have provided with respect to her actual job termination. Hanson appears to assert that she should have received an accommodation earlier in her employment—such as when she asked for a mental health day on December 20, 2019—and that the Legislature would not have terminated Hanson's employment had she received this accommodation. But this argument does not make her employment termination itself a failure to accommodate. The Court grants summary judgment with respect to this ground.

### 4.  Disparate Impact

In her final disability-related claim, Hanson alleges that the Legislature violated the ADA and ORS § 659A.112 by creating a facially neutral policy, Rule 27, that disparately impacts individuals with mental health disabilities. The Legislature argues that Hanson has not shown that Rule 27 disproportionately affects such individuals and that Hanson provides no statistical support for her claim.

Disparate impact claims under the ADA "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quoting *Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)). To establish a prima facie case for a disparate impact claim under the ADA, a plaintiff must "1) identify one or more specific employment practices at issue, 2) show a disparate impact on a protected class, and 3) establish a causal relationship between the practice(s) and the disparate impact." *Lopez v. Pac. Mar. Ass'n*, 2009 WL 10680881, at *5 (C.D. Cal. Apr. 3, 2009), *aff'd*, 657 F.3d 762 (9th Cir. 2011); *see also Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002) ("A plaintiff establishes a prima facie case of disparate impact by showing a significant disparate impact on a protected class caused by a specific, identified, employment practice or selection criterion.").

Proof of discriminatory motive is not required in a disparate impact claim. *Stout*, 276 F.3d at 1123 ("The rationale, intent or motive underlying a challenged employment practice plays no part in a prima facie case of disparate impact."). Generally, in Title VII and other discrimination cases, "[a] prima facie case of disparate impact is usually accomplished by statistical evidence showing that an employment practice selects members of a protected class in a proportion smaller than their percentage in the pool of actual applicants." *Id.* at 1122 (quotation marks omitted) (describing the standard in the context of a Title VII selection practices case).

PAGE 31 – OPINION AND ORDER

The Ninth Circuit in *Lopez*, however, noted that the ADA's text may not require statistical evidence, but found the argument waived and did not reach it on the merits. *Lopez v. Pac. Mar. Ass'n*, 657 F.3d 762, 766-67 (9th Cir. 2011). Judge Pregerson, in his partial concurrence and partial dissent, concluded that the argument had been sufficiently raised and that statistical evidence is *not* required under the ADA, distinguishing Title VII cases. *Id.* at 769-70. The Court need not reach whether statistical evidence is required in ADA cases. Even assuming no such evidence is required, Hanson provides no evidence—anecdotal, circumstantial, or otherwise— that Rule 27, or how it is implemented, adversely affects persons with disabilities more than persons without disabilities.

Hanson raises five purported "adverse impacts" from Rule 27 that she alleges disproportionately affect individuals with mental health disabilities. These include Rule 27's mandatory reporting element, its requirement or allowance of administrative leave for complainants, its employment of attorneys as independent investigators, its inflexibility towards requests to stop its investigation or offer confidential reconciliation instead, and its automatic public hearings. Hanson, however, offers no *evidence* that any aspect of the Rule 27 process disproportionally harms people with mental health disabilities. For example, she does not point to anyone else with mental health disabilities whom this policy also adversely impacted. Instead, she "offers only the bald assertion that this result *must* be so." *Lopez*, 657 F.3d at 766 (emphasis in original). Her contention is insufficient. *Id.*; *see also Jefferson v. Time Warner Cable*, 2012 WL 12887692, at *15 (C.D. Cal. July 23, 2012) (granting summary judgment on the plaintiff's ADA disparate impact claim because the plaintiff relied on his own assertion that the policy disproportionately affects persons with disabilities). The Court grants the Legislature's motion

for summary judgment against Hanson's claims of disparate impact under the ADA and Oregon law.

**B. FMLA and OFLA Claims**

Hanson's fourth, fifth, sixth, and seventh claims allege violations of both the FMLA and OFLA. Hanson alleges that the Legislature interfered with and retaliated against her in several ways for exercising or trying to exercise her rights to take medical leave under these statutes. The Legislature argues that the FMLA does not apply to Hanson because her position is exempt from the statute. The Legislature also argues that it is entitled to summary judgment on Hanson's interference claim because Hanson received the leave that she requested, and on her retaliation claim because her employment termination was too remote in time from any possible leave request. Hanson cross-moves for summary judgment on her OFLA interference claim. She also argues that her sixth claim for OFLA retaliation should have been alleged as another OFLA interference claim, like her fourth claim, and requests that the Court interpret that claim as such.

The purpose of the FMLA is "to balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons" while still "accommodat[ing] the legitimate interests of employers." 29 U.S.C. § 2601(b). Courts analyze OFLA and FMLA claims together as much as possible because OFLA is construed "to the extent possible in a manner that is consistent with any similar provisions" of the FMLA. ORS § 659A.186(2). The Court first describes why the FMLA does not apply to Hanson. The Court then resolves the pending motions on Hanson's OFLA interference claim. Finally, the Court addresses the pending motions on Hanson's OFLA retaliation claim and her request that it be treated as an OFLA interference claim.

1. **FMLA Applicability**

   a. **"Personal Staff" Exception**

The Legislature argues that Hanson was not eligible for FMLA leave, and therefore her

fifth and seventh claims fail as a matter of law. The Legislature asserts that the FMLA exempts

all employees of a state legislature except for those working in its library, but the most relevant

portion of the statute is its "personal staff" exemption. This provision, in relevant part, defines

"employee" as

> (C) any individual employed by a State, political subdivision of a
> State, or an interstate governmental agency, other than such an
> individual—
>
>> (i) who is not subject to the civil service laws of the State,
>> political subdivision, or agency which employees him; and
>>
>> (ii) who—
>>
>>> (I) holds a public elective office of that State,
>>> political subdivision, or agency, [or]
>>>
>>> (II) is selected by the holder of such an officer to be
>>> a member of his personal staff . . . .

29 U.S.C. § 203(e)(2)(C)(ii)(II).

"Employees in high-ranking or sensitive positions are simply ineligible for FMLA leave;

of particular importance to the States, FMLA expressly excludes from coverage state elected

officials, *their staffs*, and appointed policymakers." *Nev. Dep't of Hum. Res. v. Hibbs*, 538

U.S. 721, 739 (2003) (emphasis added). To be exempt from the FMLA under this statutory

framework, Hanson must (1) not be subject to Oregon's civil service laws and (2) qualify as a

"personal staff member" of Gelser Blouin. *See Ramirez v. San Mateo Cnty. Dist. Att'y's Off.*, 639

F.2d 509, 512-513 (9th Cir. 1981); *Austin v. Cook Cnty.*, 2011 WL 5872836, at *4-5 (N.D. Ill.

Nov. 16, 2011) (applying this two-part test even when "the parties do not parse the language of the statute and apply it to the facts of this case").

The first prong of this test asks whether Hanson was subject to Oregon's civil service laws. Oregon's civil service laws organizes positions "in the service of the state" into four categories: the classified service, ORS § 240.210; the unclassified service, ORS § 240.205; the exempt service, ORS § 240.200; and the management service, ORS § 240.212. *Nelson-Baca v. Oregon*, 2021 WL 3702486, at *6 (D. Or. Apr. 21, 2021). State employees in the unclassified and exempt services "are employed at-will and lack as a matter of law any property interest in their continued employment." *Id.* The exempt service category includes "[o]fficers and employees of the Legislature." ORS § 240.200(4). Employees in the exempt category are not subject to Oregon's civil service laws. ORS § 240.245.

The parties agree that Hanson was an employee of the Legislature. Hanson's only argument against the exempt service categorization is that she also was subject to the Oregon Equal Pay Act, and possibly other restrictions, that she argues qualify as "civil service laws" under 29 C.F.R. § 553.11(c). Hanson misstates the law.

Section 553.11(c) does not "define" civil service laws in a way that encompasses a range of regulations, as Hanson argues. Rather, § 553.11(c) describes what civil service laws *are:* a "personnel system established by law" to protect certain employees. *Id.* The Legislature rightly points out that Hanson's argument would undermine ORS § 240.200 and 29 U.S.C. § 203(e)(2)(C), and further that Hanson does not cite any support for her position. The Court concludes that Hanson is exempt from Oregon's civil service laws and thus passes the first prong of the two-part personal staff exception test.

The second prong asks whether Hanson was a member of Gelser Blouin's personal staff. Courts weigh six factors when deciding whether someone is a personal staff member of an elected official:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Rutland v. Pepper*, 404 F.3d 921, 923-24 (5th Cir. 2005) (applying factors from *Teneyuca v. Bexar Cnty.*, 767 F.2d 148, 151 (5th Cir. 1985)). The personal staff exemption is meant to exclude individuals in "highly intimate and sensitive positions of responsibility on the staff of the elected official." *Lane v. Grant Cnty.*, 2013 WL 209178, at *3-4 (E.D. Wash. Jan. 17, 2013). Each *Teneyuca* factor supports the conclusion that Hanson was a member of Gelser Blouin's personal staff.

The personal staff exemption to the FMLA must be narrowly construed. *Rutland*, 404 F.3d at 924. It is a fact-intensive inquiry that "does not lend itself well to disposition by summary judgment." *Id.* (quoting *Teneyuca*, 767 F.2d at 152). That said, the Court concludes that there is no genuine dispute as to any material fact that Hanson's position of "chief of staff" is a quintessential example of when the personal staff exclusion applies. Thus, Hanson was exempt from the FMLA.

### b. Equitable Estoppel

Hanson argues that even if she were exempt from the FMLA, the Legislature should be equitably estopped from arguing so because it had told Hanson the opposite. The doctrine of equitable estoppel is "invoked to avoid injustice in particular cases," where the enforcement

rights of one party would create injustice to the other party who has justifiably relied on the

words or conduct of the party against whom estoppel is sought. *See Heckler v. Comm. Health*

*Serv's of Crawford Cnty.*, 467 U.S. 51, 59 (1984). Generally, in the Ninth Circuit,

> [t]he traditional elements of an equitable estoppel claim include
> (1) the party to be estopped must know the facts; (2) he must
> intend that his conduct shall be acted on or must so act that the
> party asserting the estoppel has a right to believe it is so intended;
> (3) the latter must be ignorant of the true facts; and (4) he must rely
> on the former's conduct to his injury.

*Baccei v. United States*, 632 F.3d 1140, 1147 (9th Cir. 2011) (quotation marks omitted).

The Ninth Circuit has not yet addressed the contours of equitable estoppel in the FMLA

eligibility context. Other circuit courts, however, have concluded that the first factor, knowledge

of the facts by the party to be estopped, is not required in this context, and that the second factor

merely requires that the party must have had "reason to believe" that the employee would act on

the representation. *See Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 556-57 (6th

Cir. 2009); *Minard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352, 359 (5th Cir. 2006); *Duty v.

Norton-Alcoa Proppants*, 293 F.3d 481, 493-94 (8th Cir. 2002); *Kosakow v. New Rochelle

Radiology Assocs.*, 274 F.3d 706, 725-26 (2d Cir. 2001).

Regardless of whether the first two factors need to be shown, Hanson fails to raise a

genuine issue of material fact on the final factor—that she reasonably relied on any

representation of her eligibility for FMLA leave and that she acted on this representation to her

detriment. Hanson contends that she relied on FMLA eligibility misrepresentations when

registering her concern over possible retaliation to Knieling or participating in the Rule 27

investigation. There is, however, not a "scintilla of evidence" in support of this contention. *See

Anderson*, 477 U.S. at 252. Even if there were, no evidence shows that these instances of

purported reliance put Hanson in a worse position than otherwise. Her January 2, 2020, email

report to Knieling merely mentioned "OFLA leave" and "taking FMLA" as possible causes of the alleged retaliation that Hanson already experienced. Stating in January 2020 that she believed she suffered retaliation in 2019 for "taking FMLA" and "OFLA leave" is not *itself* evidence of detrimental reliance on any representation by the Legislature that Hanson was eligible to take FMLA leave. Finally, Hanson does not claim that she relied on any misrepresentation of FMLA eligibility when taking her leave, nor that any such reliance would have been detrimental. Hanson's equitable estoppel claim fails, and the Legislature's motion for summary judgment is granted with respect to Hanson's FMLA claims.

### 2. OFLA Interference

Hanson asserts in her sixth claim for relief that the Legislature interfered with her right to take protected medical leave. OFLA makes it unlawful for employers to "[r]etaliate or in any way discriminate against an individual with respect to hire or tenure or any other term or condition of employment" if that individual asks about, requests, or takes protected leave. ORS § 659A.183. OFLA provides no explicit interference claim. As previously noted, OFLA is to be construed as much as possible consistent with the FMLA. ORS § 659A.186(2); *see also Sanders v. Newport*, 657 F.3d 772, 783 (9th Cir. 2011) ("Consistent with this legislative declared intent, the Oregon courts have looked to federal law when interpreting OFLA."); *Ossanna v. Nike, Inc.*, 365 Or. 196, 205 (2019) (noting that ORS § 659A.186(2) "requir[es] consistent construction between Oregon Family Leave Act and the federal Family and Medical Leave Act of 1993"). Courts have thus allowed claims of OFLA interference, looking to the standards for FMLA interference. *See, e.g.*, *Stillwell v. Old Dominion Freight Line, Inc.*, 2021 WL 3056375, at *6 (D. Or. July 20, 2021) ("A majority of decisions in the District of Oregon, however, have concluded that the OFLA includes a cause of action for interference. These cases largely reach this result with minimal analysis, highlighting either the parties' agreement that the OFLA and FMLA

claims are coterminous or looking to the OFLA's text directing that it be interpreted with reference to the FMLA." (footnote omitted) (gathering cases)).

To state an FMLA interference (and therefore OFLA interference) claim, a plaintiff must establish that: (1) she was eligible for FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of intent to take leave; and (5) her employer denied her FMLA benefits. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014); *Sanders*, 657 F.3d at 778. The employee also has the burden of proving "real impairment of their rights and resulting prejudice." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90-91 (2002) (noting that the FMLA requires employees to show "consequential harm"). To prevail on an interference claim, a plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in [an adverse employment decision]." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001). "In interference claims, the employer's intent is irrelevant to a determination of liability." *Sanders*, 657 F.3d at 778.

As to the fourth element of the prima facie case for interference, sufficient notice of intent to take leave, "it is the employer's responsibility, not the employee's, to determine whether a leave request is likely to be covered by the Act." *Bachelder*, 259 F.3d at 1130. "Employees need only notify their employers that they will be absent under circumstances which indicate that the FMLA might apply." *Id.* If the employer is unsure whether the employee's request qualifies for FMLA protection, it is the *employer's* responsibility to seek more information, including medical certification if necessary. *Id.* at 1130-31.

### a.   Legislature's Motion for Summary Judgment

#### i.   October 2019 Leave

The Legislature asserts that Hanson fails to make a prima facie case of OFLA interference as to her October 2019 leave for her concussion. The Legislature puts forth two arguments. First, the Legislature argues that Hanson was not eligible for FMLA protection by October 2019 because she had not yet worked at the Legislature long enough to qualify. Second, the Legislature points to undisputed evidence that Hanson took and was paid for her October 2019 medical leave.

The Legislature's first argument is unavailing. The Legislature correctly states that employees must have worked for their employers for one year to be covered by FMLA. OFLA, however, diverges from FMLA in this respect. Instead of one year, an employee becomes an 'eligible employee' under OFLA on their 180th day of employment. ORS § 659A.156(1)(a); *Yeager v. Providence Health Sys. Or.*, 195 Or. App. 134, 137 (2004). The parties do not dispute that Hanson had worked for the Legislature for at least 180 days by the time of her concussion-related leave in October and November of 2019. Accordingly, Hanson was eligible for OFLA protection by October 2019.

The Court agrees, however, with the Legislature's argument that Hanson took paid leave for her concussion and therefore did not experience OFLA interference. Hanson alleges that Gelser Blouin opposed Hanson's attempt to be *paid* for her October 2019 medical leave. To support this claim at summary judgment, Hanson states in her declaration that Gelser Blouin challenged whether the leave should have been paid and reduced the amount of paid leave Hanson had available by instructing her to have human resources enter leave from a July 2019 camping trip Hanson had taken. Hanson also presents as evidence a series of eight emails

between herself and a Human Resources Analyst for the Legislature that involves a discussion of Hanson's October medical leave.

It is undisputed that Hanson took and was paid for her October 2019 leave. OFLA, however, protects up to 12 weeks of *unpaid* leave a year for certain qualifying conditions. *Centennial Sch. Dist. No. 28J v. Or. Bur. of Lab. & Indus.*, 169 Or. App. 489, 498 (2000). If she wishes, an employee may elect to use her "accrued sick leave" to take her OFLA leave as paid. *Id.* The Legislature's Human Resources Analyst explained this to Hanson in an email. Hanson did just that. Gelser Blouin did not interfere with Hanson's OFLA right to *unpaid* leave by instructing Hanson to work with Human Resources and use sick time to get paid for that October 2019 leave. Even viewing the evidence in the light most favorable to Hanson, the Court does not find that Hanson raises a genuine issue of material fact as to whether Gelser Blouin interfered with Hanson's October 2019 OFLA leave. The Legislature's motion for summary judgment is granted as to Hanson's claim for OFLA interference based on her October 2019 leave.

### ii.   December 2019 Leave

The Legislature also argues that Hanson fails to make a prima facie case of OFLA interference for her requested "mental health" day in December 2019. The Legislature makes two arguments. First, the Legislature asserts that Hanson provides no evidence that she made a "formal" application for protected medical leave to trigger the FMLA or OFLA. Second, the Legislature argues that records show Hanson did, in fact, take off December 20, 2019 from work.

The Legislature's first argument fails because a "formal" application for leave is not required under the FMLA or OFLA. Under the FMLA, an employee merely has to provide notice as "soon as practicable," which should be no later than the same or next business day for unforeseeable leave. 29 C.F.R. § 825.302(a)-(b). It is the employer's responsibility to "inquire further of the employee if it is necessary to have more information about whether FMLA leave is

being sought by the employee, and obtain the necessary details of the leave to be taken." *Id.*

§ 825.302(c). This is particularly true for medical conditions, for which "the employer may find

it necessary to inquire further to determine if the leave is because of a serious health condition

and may request medical certification to support the need for such leave." *Id.*

       Under OFLA, the employee must follow the employer's "known, reasonable and

customary procedures for requesting any kind of leave, absent unusual circumstances" if the

employee is able to give advanced notice. Or. Admin. R. § 839-009-0250(1)(a). The employer

may then request additional information. *Id.* § 839-009-0250(1)(b). The Legislature, however,

has not provided evidence of its known, reasonable, and customary procedures for requesting

OFLA or FMLA leave.

       When Hanson asked Gelser Blouin for a "mental health" day on December 20, 2019,

Hanson sent the following email:

> My therapist recommended that I take a mental health day soon
> (she's willing to send a doctor's note to you/HR if that's
> helpful) . . . I'm thinking about taking the 20th as a mental health
> day because the need is urgent (I would take it tomorrow, but
> that's too much to dump on you and I can wait two days).

ECF 43-1 at 2. There is no evidence that this notice did not comply with the Legislature's

appropriate procedures for requesting leave, nor does the evidence support that this notice was

not given as soon as practicable.

       The Legislature's second argument also is unavailing. At summary judgment, the Court

views the evidence and draws all reasonable inferences in the light most favorable to the non-

movant. Hanson has provided in declarations that she could not meaningfully take off

December 20, 2019, because Gelser Blouin assigned Hanson too much work. Viewing the

evidence in the light most favorable to Hanson, the Court finds a genuine issue of material fact as

to whether Hanson was able meaningfully to take a day of medical leave. The Legislature's

motion for summary judgment is denied with respect to the remainder of Hanson's OFLA interference claim.

### b.  Hanson's Cross-Motion for Partial Summary Judgment

Hanson cross-moves for summary judgment on her claim that the Legislature violated Hanson's OFLA rights by interfering with her "mental health" day of leave in December 2019. Hanson argues that Gelser Blouin interfered with Hanson's OFLA rights by describing December 20, 2019, as not a convenient day to take leave; by requiring Hanson to finish certain tasks before taking leave; and by categorizing Hanson's mental health day as "just a sick day."

Viewing the evidence in the light most favorable to the Legislature on Hanson's cross-motion, the Court finds genuine disputes of facts material to this claim. First, Gelser Blouin denies that she called Hanson's proposal "inconvenient" or required her to work on a day she wanted off. Second, the record shows that Gelser Blouin responded in writing on December 18th to Hanson's request by stating that the "mental health day" would be a sick day and Hanson had "a lot of sick time," but emphasized that Hanson needed to submit the sick day so neither Gelser Blouin nor Hanson would "get in trouble." Baumgart found that the evidence did not support Hanson's contention that Gelser Blouin verbally stated at some point on December 18th that taking the mental health day on December 20th would be inconvenient. Third, Gelser Blouin contends that she asked Hanson to complete three tasks that demanded "no more than fifteen minutes during the day [Hanson] was scheduled to work before the days she wished to take leave" and that Gelser Blouin believed Hanson could complete those tasks before her requested leave day. Fourth, the Court observes that Gelser Blouin called Hanson's mental health day "just a sick day" in the context of discussing how Hanson should treat it administratively. Thus, there are genuine disputes of material fact as to whether Gelser Blouin described December 20th as an inconvenient day for Hanson to take leave and whether Gelser Blouin assigned too much work to

prevent Hanson from practically taking December 20th as medical leave. The Court denies

Hanson's motion for partial summary judgment with respect to her OFLA interference claim.

### 3. OFLA Retaliation

#### a. Interpretation as Retaliation or Interference

Hanson argues that the Court should construe her sixth claim for OFLA retaliation as

another claim for OFLA interference.[8] For support, Hanson cites instances when the Ninth

Circuit construed FMLA retaliation claims as interference claims. These interpretations are based

on the text of the FMLA.

The FMLA's "interference" provision states:

> (a) Interference with rights
>
>> (1) Exercise of rights
>>
>> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

9 U.S.C. § 2615.

In contrast, the FMLA's "discrimination" and "retaliation" provisions establish:

> (a) Interference with rights
>
>> * * *
>> (2) Discrimination
>>
>> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.
>
> (b) Interference with proceedings or inquiries

---

[8] Hanson makes the same argument as to her seventh claim, which is pleaded as FMLA retaliation. Because the Court finds that Hanson was ineligible under the FMLA and grants summary judgment on this claim, Hanson's argument is moot.

It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual—

> (1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

> (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

9 U.S.C.A. § 2615.

The Ninth Circuit has explained that many alleged FMLA "retaliation" claims are properly considered as "interference" claims because the FMLA's "unfortunate intermixing of the two different statutory concepts [of interference and retaliation] is confusing," but the purpose of the law is clear. *Bachelder*, 259 F.3d at 1124-25. The Ninth Circuit described the difference between interference and retaliation claims under the FMLA:

> By their plain meaning, the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1), the provision governing [i]nterference with the [e]xercise of rights.

*Id.* at 1124 (quotation marks omitted).

The FMLA's retaliation provision differs from what the common usage of "retaliation" might suggest. *See id.* Courts construe claims alleging that an employer discriminated or retaliated against an employee for taking or asking about FMLA leave as an FMLA *interference* claim, even if a plaintiff has been confused by the statute's terminology. *See id.* at 1124-25; *Rieman v. Evraz, Inc.*, 848 Fed. App'x 306, 307 (9th Cir. 2021) ("We construe a claim like Rieman's—that a termination was motivated by an employee's use of protected leave—as an

'interference' claim, rather than a 'retaliation' claim."); *Ramirez v. Wynn Las Vegas, LLC*, 2022 WL 3715751, at *6 (D. Nev. Aug. 29, 2022) ("Though Ramirez's complaint uses the terms 'retaliation' and 'discrimination,' her claim is properly construed as an FMLA interference claim because she alleges Wynn terminated her for taking FMLA leave.").

This distinction has practical consequences because the standards for FMLA retaliation and FMLA interference claims are different. *See Bachelder*, 259 F.3d at 1131 ("[T]here is no room for a *McDonnell Douglas* type of pretext analysis when evaluating an 'interference' claim under [the FMLA.]"); *Schultz v. Wells Fargo Bank, Nat. Ass'n*, 970 F. Supp. 2d 1039, 1058 (D. Or. 2013) ("[A]lthough undecided in the Ninth Circuit, other circuits and courts in this district have adopted the *McDonnell Douglas* burden shifting framework when analyzing FMLA retaliation claims." (footnote omitted) (citing *Sanders*, 657 F.3d at 777; *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)); *see also Alcozar-Murphy v. Asarco LLC*, 744 F. App'x 411, 412 (9th Cir. 2018) (affirming, without analysis, a district court's application of the burden-shifting framework to an FMLA retaliation claim).

OFLA, however, differs textually from FMLA in this regard. OFLA provides:

> It is an unlawful practice for a covered employer to:
>
> (1) Deny family leave to which an eligible employee is entitled under ORS 659A.150 to 659A.186; or
>
> (2) Retaliate or in any way discriminate against an individual with respect to hire or tenure or any other term or condition of employment because the individual has inquired about the provisions of ORS 659A.150 to 659A.186, submitted a request for family leave or invoked any provision of ORS 659A.150 to 659A.186.

ORS § 659A.183. Thus, OFLA expressly includes in its text that visiting negative consequences on an employee for taking or trying to take OFLA leave is retaliation or discrimination, unlike

the FMLA, which does not include such violations in its retaliation and discrimination provisions and instead includes them in its interference clause.

Additionally, relying on the former text of OFLA and a broad rule promulgated by the BOLI Commissioner, the Oregon Court of Appeals has held that employees may bring "an action for retaliation under OFLA" when an employer "retaliate[s] against an employee for inquiring about OFLA leave, submitting a request for OFLA leave, or in any way invoking the provisions of OFLA." *Yeager*, 195 Or. App. at 138-39 (citing the previous version of ORS § 659A.001(12) (2001); Or. Admin. Code § 839-009-0320(3) (2002)).[9] Notably, "an OFLA retaliation claim is not limited to an employee who is eligible for and has taken OFLA-protected leave." *Id.* at 140. If an employee experiences retaliation "merely for invoking the provisions of OFLA" but is ineligible for OFLA protection, that employee still may have a claim for OFLA retaliation. *See id.*

As explained, OFLA is "construed *to the extent possible* in a manner that is consistent with any *similar* provision of the federal Family and Medical Leave Act of 1993 [FMLA]." ORS § 659A.186(2) (emphasis added). Because OFLA's text meaningfully differs from FMLA's text in this regard, "retaliation" claims for alleged retaliatory consequences in response to an employee taking or attempting to take protected leave are appropriate under OFLA. *See Ormsby v. Sunbelt Rentals, Inc.*, 205 F. Supp. 3d 1204, 1210 (D. Or. 2016) ("Although the OFLA is to 'be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Family and Medical Leave Act of 1993,' Or. Rev. Stat. § 659A. 186(2), the text of the OFLA, unlike the text of the FMLA, clearly contemplates a discrimination claim based on an

---

[9] After the decision in *Yeager*, OFLA was amended and codified the BOLI rule and the holding in *Yeager*.

employee's inquiry about protected leave."); *cf. Taylor v. Schwan's Consumer Brands, Inc.*, 2022 WL 891826, at *7 (D. Or. Feb. 14, 2022), *report and recommendation adopted*, 2022 WL 888303 (D. Or. Mar. 24, 2022) ("To survive this motion to dismiss, Taylor need only allege a plausible OFLA retaliation claim. Taylor has plausibly alleged that his employment was terminated in retaliation for invoking rights under OFLA.").

An OFLA retaliation or discrimination claim, however, is most analogous to an FMLA interference claim. *See Bachelder*, 259 F.3d at 1124 (holding that FMLA "interference" covers situations where an employer visits "negative consequences on an employee simply because he has used FMLA leave"). Thus, it is appropriate to use the standards applicable to an FMLA interference claim when evaluating OFLA retaliation allegations. To prevail on her OFLA retaliation claim, therefore, Hanson must show that the Legislature considered Hanson's inquiries about or invocations of OFLA as a negative factor in any of the Legislature's adverse employment actions.[10] As the Court has held, the only remaining actionable adverse employment actions are the Legislature placing Hanson on paid administrative leave and terminating Hanson's employment.

### b. Legislature's Motion for Summary Judgment

The Legislature moves for summary judgment against Hanson's OFLA retaliation claim, relying only on legal standards applicable to FMLA retaliation, not FMLA interference. The

---

[10] Hanson sometimes appears to frame her claim as alleging that she suffered retaliation for *complaining that she had been retaliated against* because she used or requested leave. If that is the basis of her claim, then it would be akin to an FMLA discrimination claim under 29 U.S.C. § 2615(a)(2), which is aligned with the FMLA retaliation provision and analyzed under the *McDonnell Douglas* burden shifting standard. Hanson more frequently, however, frames her claim as alleging only that she was retaliated against for *using or requesting* protected leave. This is a claim akin to an FMLA interference claim under 29 U.S.C. § 2615(a)(1). That is the basis of Hanson's argument in her briefs that her retaliation claim should be construed as an interference claim and thus is how the Court interprets her OFLA retaliation claim.

Legislature did not respond to Hanson's argument that the Court should analyze Hanson's OFLA retaliation claim under the same standards as it would an FMLA interference claim.

Because the Court agrees with Hanson that it should apply the FMLA interference standard as the most analogous claim to an OFLA retaliation claim, the Legislature's motion for summary judgment did not raise or argue the correct legal standards. The Court grants the motion in part because Hanson's Sixth Claim for Relief asserts retaliation based on alleged adverse employment actions relating the Rule 27 process, which the Court has already analyzed and determined not to be actionable. The Sixth Claim also includes a claim based on Gelser Blouin's actions in making Hanson request sick leave for her October 2019 leave, which the Court finds is not retaliation for the same reasons the Court concluded it was not interference. Thus, the only remaining grounds supporting Claim Six are Hanson's paid administrative leave and employment termination. Now that the Court has clarified the applicable standard, if the Legislature believes that, viewing the facts in the light most favorable to Hanson, there is no genuine dispute of material fact on Hanson's OFLA retaliation claim based on those two adverse actions, then the Legislature may file a renewed motion on this claim.

### c. Hanson's Cross-Motion for Partial Summary Judgment

#### i. Paid Administrative Leave

Hanson argues that she was placed on administrative leave and that the Rule 27 investigation was *triggered* because Hanson requested and took OFLA leave and then reported that the Legislature had retaliated against her for doing so. Therefore, argues Hanson, as a matter of law her OFLA leave was a negative factor that the Legislature considered when placing Hanson on paid administrative leave. As the Court already has concluded, however, there is no genuine dispute that the investigation was *triggered* by Hanson's text accusing Gelser Blouin of creating a toxic and abusive work environment, not Hanson's claim of OFLA retaliation.

PAGE 49 – OPINION AND ORDER

Further, as discussed earlier in the context of Hanson's ADA discrimination claim, there are issues of fact for the jury as to whether Hanson's use of or request for leave was a causal factor in the Legislature's decision to place Hanson on paid administrative leave. But that is not a basis on which to *grant* Hanson's motion for partial summary judgment, when the Court must view the facts in the light most favorable to the Legislature. Accordingly, Hanson's motion for partial summary judgment is denied with respect to her OFLA retaliation claim based on the adverse employment action of the Legislature placing her on paid administrative leave.

### ii.  Termination of Employment

Finally, Hanson argues that her requests for or taking of OFLA leave were a negative factor in Gelser Blouin's decision to fire Hanson. Hanson contends that because the Rule 27 process was purportedly only initiated to investigate her OFLA/FMLA leave protections, Hanson's taking of or attempts to take leave were necessarily a factor in her employment termination. For the reasons discussed above, however, the Court rejects Hanson's argument that there are no disputed issues of material fact that the Rule 27 process was only *initiated* to investigate OFLA leave protections. The Legislature also asserts that Gelser Blouin chose to terminate Hanson's employment for other reasons and provides evidence to support that argument, including the testimony of Gelser Blouin and contemporaneous communications between Gelser Blouin and Human Resources regarding concerns with Hanson's job performance. These factual disputes preclude resolution at summary judgment. Accordingly, the Court denies Hanson's motion for partial summary judgment on her OFLA retaliation claim based on her employment termination.

### C.  Whistleblower Retaliation Claims

Hanson brings claims for whistleblower retaliation under both ORS §§ 659A.203 and 659A.199. These are statutory claims, and the text of the statutes provide the elements. *See*

*Burley v. Clackamas Cnty.*, 298 Or. App. 462, 465 (2019) (ORS § 659A.199); *Harper v. Mt. Hood Cmty. Coll.*, 283 Or. App. 207, 211-12 (2016) (ORS § 659A.203). "Loosely speaking, those whistleblowing statutes prohibit employers from retaliating against an employee as a result of the employee's report of certain improper activities. Whether the employee is protected depends upon an assessment of the employee's good faith or reasonableness attendant to that report." *Hall*, 274 Or. App. at 451.

At issue in this case is the standard of belief required at the time of reporting. The distinguishing characteristic between the statutes is that § 659A.203 requires that an employee must have had an "*objectively* reasonable belief that the public entity had engaged in unlawful conduct." *Hall*, 274 Or. App. at 454 (emphasis added). "[U]nless the trial court concludes that the record is such that no reasonable juror could find for the plaintiff on the issue, whether the employee held a reasonable belief that the employer violated the law is an issue of fact for the jury." Wa*lker v. State by & through Or. Travel Info. Council*, 367 Or. 761, 783-84 (2021).

For Hanson's claim under §§ 659A.199, however, she need only show that she had a "*subjective*, good faith" belief that she reported evidence of a violation of a law, rule, or regulation. *Hall*, 274 Or. App. at 453 (emphasis added). "[G]ood faith relates to what the employee knew at the time of the report, not to what might be shown later to be reasonable with the benefit of hindsight." *Id.* at 452.

The Legislature's motion focuses on Hanson's conduct from December 2019 as the basis for her whistleblower retaliation claims—specifically, Hanson's text message dated December 30, 2019 to Gelser Blouin alleging a "toxic and abusive" workplace and Hanson's telephone conversation with Knieling on December 31, 2019 about the Rule 27 investigation during which Knieling mentioned Hanson's OFLA and FMLA rights. The Legislature argues

that Hanson could not have reasonably, or in good faith, reported conduct that she believed was unlawful because she admits in her January 2, 2020 email that she was unaware that her FMLA or OFLA rights may have been violated until the time she sent that email. Hanson clarifies in her response that her January 2nd email is the basis for her whistleblower claim, along with her later reports to the reporter from OPB.[11] The Legislature argues in reply that the January 2nd email shows that the allegedly retaliatory conduct of the investigation had *already been triggered* by Hanson's text message alleging a "toxic and abusive" workplace. Thus, according to the Legislature, the January 2nd email is irrelevant to Hanson's whistleblower claims as she has framed them. The Legislature also argues that Hanson has provided no evidence showing a causal link between her purported whistleblowing on January 2nd and any adverse employment action. As previously discussed, the Rule 27 process did not adversely affect the terms and conditions of Hanson's employment.

### 1. Reports to Knieling

Hanson contends that she told Knieling on December 31, 2019, about instances when Hanson believed Gelser Blouin punished Hanson for taking medical leave. In Hanson's follow-up email to Knieling a few days later, Hanson referred to those instances as examples of unlawful FMLA and OFLA retaliation. Taken together, Hanson asserts that these two reports constitute a whistleblowing disclosure.

The Court considers whether at the time Hanson reported this conduct she believed in good faith, or that it was objectively reasonable to believe, that she was reporting a violation of

---

[11] In her response, Hanson clarified that her whistleblower retaliation claims pertain to (1) Hanson's telephone conversation with Knieling on December 31, 2019, "combined with" Hanson's email to Knieling on January 2, 2020, stating that Hanson believed she had experienced FMLA/OFLA retaliation; and (2) Hanson's various disclosures to OPB reporter VanderHart regarding the Rule 27 process.

law. The Court also evaluates whether there is an issue of fact on the causal connection between Hanson's purported disclosure and the Legislature placing Hanson on paid administrative leave or terminating her employment.

According to Knieling's handwritten notes memorializing the December 31st telephone conversation, Knieling began that call by informing Hanson about her rights and responsibilities under the FMLA and OFLA. Hanson then told Knieling that she felt "like [she] was in trouble for being on medical [leave]" and she "got in trouble for not working" when she was in a crisis. Hanson later emailed Knieling on January 2, 2020, stating that, upon reflection, she believed the "trouble" she had experienced was unlawful medical leave retaliation. Viewing this evidence in the light most favorable to Hanson, there is a genuine issue of material fact as to whether Hanson made a whistleblowing disclosure to Knieling and, if so, whether Hanson held a good faith or objectively reasonable belief that this disclosure implicated a violation of law, rule, or regulation.

The Court also rejects the Legislature's argument that Hanson fails to raise an issue of fact regarding a causal connection between her whistleblowing and her paid administrative leave or employment termination. To satisfy the causality element of whistleblower retaliation, Hanson must show that her disclosure was a "substantial factor" in the Legislature's alleged adverse employment action. *Harper v. Mt. Hood Cmty. Coll.*, 283 Or. App. 207, 214 (2016) (quoting *Lacasse v. Owen*, 278 Or. App. 24, 32-33 (2016)). This "substantial factor" test amounts to a "but for" standard, meaning that the plaintiff "would have been treated differently in the absence of the unlawful motive." *Lacasse*, 278 Or. App. at 32-33. "Generally, to determine whether there is a causal connection, we examine the knowledge of plaintiff's reports by the supervisor responsible for plaintiff's discharge and the timing of that discharge—when considering whether

a reasonable juror could infer that defendant had a retaliatory motive in discharging plaintiff" under ORS § 659A.203. *Harper*, 283 Or. App. at 214.

The Legislature is correct that the evidence shows that the Rule 27 process already had begun as of the December 31st telephone conversation and before the January 2nd email. The parties dispute, however, whether it was required that *Hanson* be placed on administrative leave during that process because she was not the subject of the Rule 27 investigation. A jury reasonably could conclude that Hanson was placed on administrative leave despite her not being the person under investigation as retaliation for Hanson's whistleblowing conduct or to deter other employees from reporting unlawful conduct. *See, e.g.*, *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (stating in the Title VII context that for retaliation claims, an action is "cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity"). The person who placed Hanson on leave knew about Hanson's reports, and Hanson was placed on leave shortly after making her disclosure. As Nathan Monson states in his declaration, persons complaining of harassment and discrimination were put on leave and that the paid leave policy was used to get rid of such employees.

Hanson also was terminated the same day that Gelser Blouin was cleared of wrongdoing. As discussed in the context of Hanson's ADA claim, viewing the evidence in the light most favorable to Hanson, a jury could reasonably conclude that Gelser Blouin terminated Hanson because of her whistleblowing activity but had been restrained from doing so until the Rule 27 investigation was completed. Accordingly, the Court denies the Legislature's motion for summary judgment as to Hanson's ORS §§ 659A.203 and 659A.199 claims that the Legislature retaliated against Hanson for reporting medical leave retaliation to Knieling.

### 2.   Reports to OPB News Reporter

The Legislature also moves for summary judgment against Hanson's whistleblower claims related to Hanson's conversations with VanderHart, a reporter for OPB, in February 2020. The Legislature argues that the undisputed timeline of events precludes a finding that Hanson's disclosure to OPB could have motivated the Legislature to retaliate and that Hanson provides no evidence of causality between this disclosure and any retaliation.

The Court agrees in part with the Legislature's first point. Hanson communicated with OPB beginning in February 2020. By then, the Legislature already had placed Hanson on paid administrative leave. Thus, Hanson's disclosure to OPB could not have motivated the Legislature to place Hanson on paid leave, and the Court grants the Legislature's motion as to Hanson's claim to this extent. Accordingly, Hanson may only argue that the Legislature retaliated against her for whistleblowing to OPB by terminating her employment.

According to Hanson, she communicated with VanderHart during her paid leave about the Legislature's refusal to halt the Rule 27 investigation and its choice to "spend excessive money to pay lawyers to punish people coming forward with harassment and discrimination complaints" rather than "protect employees and make the workplace safe." Hanson also gave copies to VanderHart of the text messages that Hanson says she believed were evidence of a violation of a law, rule, or regulation, or mismanagement or abuse of authority. This is sufficient to create an issue of fact regarding Hanson's subjective and objective good faith belief at the time of reporting.

As for causality, the record shows that Gelser Blouin was aware of Hanson's communications with VanderHart before the conclusion of the Rule 27 investigation. In her deposition, Gelser Blouin states that she had been told that Hanson "approached Dirk VanderHart of OPB early in the process in February" and that Hanson "was pushing Dirk to

write a story that would destroy my [Gelser Blouin's] career." Although the gap between Hanson meeting with VanderHart and getting fired by Gelser Blouin may be as long as eight months, Hanson was on paid leave during that time due to the ongoing Rule 27 investigation. As noted, however, Gelser Blouin fired Hanson the same day that the Senate Conduct Committee concluded that Gelser Blouin had not violated any rules or laws. Viewing the evidence in the light most favorable to Hanson and drawing all reasonable inferences in her favor, a jury reasonably could conclude that Hanson's disclosure to OPB was a substantial factor in Gelser Blouin's decision to fire Hanson immediately upon the conclusion of the Rule 27 investigation. The Court denies the Legislature's motion for summary judgment as to Hanson's claims under ORS §§ 659A.199 and 659A.203 that the Legislature terminated Hanson for making disclosures to OPB about the Legislature's purported violations of state and federal law, mismanagement, gross waste of funds, and abuse of authority.

## CONCLUSION

The Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment (ECF 39) and DENIES Plaintiff's Motion for Partial Summary Judgment (ECF 41). The following claims, and only the following claims, may proceed to trial: (1) disability discrimination under the ADA and Oregon law based on (a) placing Hanson on paid administrative leave and (b) terminating her employment; (2) failure to accommodate a disability under the ADA and Oregon law based on Hanson's request for leave in December 2019; (3) OFLA interference based on Hanson's request for leave in December 2019; (4) OFLA retaliation based on (a) placing Hanson on paid administrative leave and (b) terminating her employment; (5) Oregon Whistleblower Retaliation relating to Hanson's disclosures to Knieling based on (a) placing Hanson on paid administrative leave and (b) terminating her employment; and (6) Oregon Whistleblower Retaliation relating to Hanson's disclosures to OPB news reporter

Dirk VanderHart based on terminating Hanson's employment. The Court grants summary

judgment in favor of Defendant on all other claims asserted by Plaintiff.

**IT IS SO ORDERED**.

DATED this 3rd day of January, 2023.

_/s/ Michael H. Simon_
Michael H. Simon
United States District Judge