Rebecca Cambreleng, OSB No. 133209
rebecca@employmentlaw-nw.com
Ashley A. Marton, OSB No. 171584
ashley@employmentlaw-nw.com
**CAMBRELENG & MARTON LLC**
3518 S. Corbett Ave.
Portland, Oregon 97239
Telephone: (503) 477-4899
*Of Attorneys for Plaintiff*

Meredith Holley, OSB No. 125647
Meredith@erisresolution.com
**Law Office of Meredith Holley**
207 E 5th Avenue, Suite 254
Eugene, Oregon 97401
Telephone: (458) 221-2671
*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LAURA HANSON,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF OREGON LEGISLATIVE ASSEMBLY,<br><br>Defendant. | Case No. 3:21-CV-00780-SI<br><br>PLAINTIFF'S TRIAL MEMORANDUM |

## INTRODUCTION

Plaintiff Laura Hanson alleges violations of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.*; Rehabilitation Act, 29 U.S.C. § 701, *et seq.*; disability discrimination pursuant to ORS 659A.112; OFLA interference and discrimination pursuant to ORS 659A.183; and whistleblower retaliation pursuant to ORS 659A.199 and ORS 659A.203.

# FACTS

Plaintiff Laura Hanson worked for the Defendant Oregon legislature between December 5, 2018, and October 7, 2020, as a Legislative Assistant I, or Chief of Staff for Senator Sara Gelser (now Gelser-Blouin). At the time of her hire, Ms. Hanson had diagnosed disabilities including post-traumatic stress disorder (PTSD), irritable bowel syndrome (IBS), anxiety, and depression.

On December 10, 2019, by text, Ms. Hanson told Sen. Gelser that she had been diagnosed with attention deficit hyperactivity disorder (ADHD). At that time, the legislature was out of session. Ms. Hanson had begun to experience panic attacks related to work and was very anxious and fearful about communication with Sen. Gelser.

On December 17, 2019, Ms. Hanson saw her therapist after a panic attack. Her therapist told Ms. Hanson that she urgently needed to take a day off. Ms. Hanson wrote to Sen. Gelser that day by email in relevant part, "My therapist recommended that I take a mental health day soon (she's willing to send a doctor's note to you/HR if that's helpful) … I'm thinking about taking the 20th as a mental health day because the need is urgent (I would take tomorrow, but that's too much to dump on you and I can wait two days)." Sen. Gelser did not ask Ms. Hanson to submit any forms, but responded in relevant part, "And for the mental health day, that's basically just a sick day and I think you have a lot of sick time. Just be sure it gets submitted so that neither of us gets in trouble."

In person, the next day, December 18, 2019, Ms. Hanson recalls Sen. Gelser saying that it would not be convenient for her to take a day off that week, but that it would be better for Ms. Hanson to wait until the next week because Sen. Gelser would be out for the Christmas holiday. Sen. Gelser's notes regarding their in-person conversation reflects a similar memory, saying that although Sen. Gelser told Ms. Hanson that if she needed to take a day sooner, she could, but "I also suggested closing the office the following week with combination of

holiday/sick/vacation/personal time so that there was the chance for a more lengthy recharge and ability to just close up shop."

Ms. Hanson texted Sen. Gelser that afternoon, saying that she had a 100-degree fever. Ms. Hanson took time off the next morning, texting Sen. Gelser that her fever was "raging." That day, Ms. Hanson also emailed Sen. Gelser on December 18, 2019, confirming that she was planning to take Friday, December 20, and Monday, December 23, 2019, as "mental health" days her therapist prescribed.

On December 19, 2019, Sen. Gelser assigned Ms. Hanson more work than she could accomplish that day in order to take leave on December 20. For example, at 12:18 p.m., Sen. Gelser emailed Ms. Hanson asking her to "nail that date down before you leave" regarding a town hall event planned for January 2020. At 5:18 p.m., Ms. Hanson emailed Sen. Gelser that she would work the next day to schedule the town hall event. At 10:00 p.m. that evening, Sen. Gelser emailed Ms. Hanson asking her to move events that were on her calendar for December 30. Ms. Hanson worked between December 17 and 23, answering emails, scheduling a town hall event, and responding by text to Sen. Gelser, who became increasingly upset over the holiday week about an issue with Ms. Hanson's cell phone. Sen. Gelser began texting Ms. Hanson again on December 27, and Ms. Hanson continued to respond to her and work on the senator's calendar events until she returned to work on December 30, 2019.

On December 30, 2019, at around 9:45 a.m. Sen. Gelser met with Jessica Knieling, Defendant's Human Resources Director. Sen. Gelser told Ms. Knieling she had concerns about Ms. Hanson's performance and told Dir. Knieling about Ms. Hanson's ADHD diagnosis. She also told Dir. Knieling that she knew Ms. Hanson was having panic attacks. At no point did Defendant engage in any interactive process to accommodate Ms. Hanson's ADHD or panic attacks.

After leaving her conversation, Sen. Gelser texted with Ms. Hanson about an error in scheduling the event Ms. Hanson was working on when she needed to take a mental health day.

Cambreleng & Marton LLC
3518 S Corbett Ave
Portland, Oregon 97239
(503) 477-4899

Sen. Gelser texted in relevant part, "There are so many consistent errors and that is not sustainable." Ms. Hanson responded in relevant part saying, "I can't be successful professionally in such an emotionally toxic and abusive environment."

Sen. Gelser reported this to Dir. Knieling, who set up a phone call with Ms. Hanson. On December 31, 2019, Dir. Knieling told Ms. Hanson that her need for a day off may have been protected under the law and that she had rights under FMLA and OFLA. In the context of discussing Ms. Hanson's text to Sen. Gelser about the toxic and abusive environment, Dir. Knieling asked Ms. Hanson if she needed any disability accommodations. Because she did not feel a disability accommodation would stop the communication from Sen. Gelser that she was concerned about, Ms. Hanson answered that she did not believe an accommodation would help.

On January 2, 2020, Ms. Hanson emailed Dir. Knieling, saying that she believed some of what she experienced was "retaliation for taking OFLA leave last week (and attempting to take it the week before), and retaliation for taking FMLA." She also told Dir. Knieling, "I don't have any immediate safety concerns for myself and, as I intended in sending that text, the behavior that was concerning me has stopped." At some point, at the latest by January 2, 2020, Dir. Knieling involved Brenda Baumgart, an attorney hired by Defendant to conduct investigations under a policy called "Rule 27."

Rule 27 prohibited conduct that constituted harassment, "an unlawful practice that aids and abets discrimination in a place of public accommodation," and retaliation. H.C.R. 20 (8). Rule 27 listed protected classes, including "Taking leave from work for purposes protected by law …". H.C.R. 20(3)(r)(L). Rule 27 required that if Defendant received a conduct complaint that may fall under Rule 27's prohibitions, an outside "independent investigator" would make a prima facie review to determine whether the alleged conduct, if true, would violate Rule 27. H.C.R. 20(11)(i). Rule 27 designated that the independent investigator could determine whether any safety measure needed to be implemented "to ensure the safety of the complainant or any individual who has

experienced behavior that is prohibited" by Rule 27. H.C.R. 20(13)(a). The rule was clear, though, "Any interim safety measure that is recommended or implemented may not prejudice a complainant or put a complainant in a worse position than the complainant was in before the complaint was made." H.C.R. 20(13)(b). According to Ms. Baumgart, Ms. Hanson was the "complainant" in the investigation that followed, however defendant did not follow this process regarding "interim safety measures."

Instead, although Ms. Hanson told Dir. Knieling she did not need an interim safety measure, after Ms. Hanson's report that she may have been experiencing medical leave retaliation, Dir. Knieling began taking action to restrict her from work. On January 2, 2020, at 5:17 p.m., Dir. Knieling emailed Sen. Gelser, "Senator, I have a meeting in the morning to discuss budget options to move forward with administrative leave."

On January 5, 2020, Sen. Gelser texted Ms. Hanson, asking that she meet with Sen. Gelser and Dir. Knieling on January 6, 2020. Ms. Hanson emailed Dir. Knieling, saying that she wanted her attorney to be present if the meeting was related to any investigation. Dir. Knieling promised Ms. Hanson, "The meeting tomorrow has nothing to do with the investigation," although in fact Dir. Knieling had scheduled the meeting to restrict Ms. Hanson from work and order her to comply with the Rule 27 investigation.

On January 6, 2020, Dir. Knieling presented Ms. Hanson with a letter restricting her from work, requiring her to meet with Ms. Baumgart, and restricting her from the workplace, which in this case was the Capitol building. The letter stated in part, "It is important to note this action is being taken to protect both you and the Senator. The action does not reflect any finding of inappropriate behavior by either of you." At this point, Ms. Hanson had not been accused of any wrongdoing. Dir. Knieling has explained that in part Ms. Hanson's restrictions were to protect Sen. Gelser from additional complaints from Ms. Hanson. The letter goes on to provide these assignments and restrictions in relevant part:

While duty stationed at home on paid administrative leave you are to:

1. Stay at home during these scheduled working hours from 8:00 a.m. to 12:00 p.m. and from 1:00 p.m. to 5:00 p.m., Monday through Friday;

2. Be available to be contacted by outside counsel, Brenda Baumgart or Human resources during your scheduled working hours; …

3. Do not enter your workplace until further notice; … .

Dir. Knieling instructed Ms. Hanson to turn in her badge and computer. Ms. Hanson, confused, asked how she would be able to do the work Sen. Gelser needed if she did not have her computer. Dir. Knieling explained that Ms. Hanson would not be doing any work for the senator. As of January 6, 2020, Sen. Gelser did not intend to terminate Ms. Hanson's employment.

Dir. Knieling told Ms. Hanson she could have time to gather any documents she needed for the investigation and complete any work she needed to finish that day. Ms. Hanson asked whether the legislature could see emails if she forwarded them to her attorney. Dir. Gelser told Ms. Hanson that the legislature could track all emails that were forwarded.

Sen. Gelser had instructed Ms. Hanson to primarily use Sen. Gelser's email account for work, and so a number of the emails Ms. Hanson felt she needed to collect were public record emails in Sen. Gelser's account. Sen. Gelser had told Ms. Hanson that she did not like her "sent" box to be cluttered and wanted all emails filed in folders. Ms. Hanson forwarded emails from Sen. Gelser's email account to Ms. Hanson's legislature email account and then to her personal email. The legislature's email system automatically marks these emails as having been forwarded. Ms. Hanson then deleted the items in Sen. Gelser's "sent" box to keep that box clean, but all of the records of the forwards continued to exist in Ms. Hanson's legislature email and all of the original emails stayed in Sen. Gelser's account with the notation that they had been forwarded.

After Ms. Hanson went home on January 6, 2020, Defendant did not assign her any more work, but expected her to stay at home, restricted from making a meaningful contribution to the

workplace. Defendant restricted Ms. Hanson from work for 10 months, during which Brenda Baumgart, the attorney working as the legislature's investigator, interviewed Ms. Hanson three times, one of those times taking over six hours to question her about her job responsibilities and performance. This after Ms. Hanson had stated that the investigation was taking a toll on her mental health to where she was suffering from suicidal ideations. Multiple times, starting early in the investigation process, Ms. Hanson asked if she could stop the investigation. She was told that there was no stopping the process, and that it would move forward with or without her participation. Ms. Hanson elected to participate as she felt that she had no choice – she was the only staff in Sen. Gelser's office, and she wanted ownership of her story that was going to be publicly disseminated and attributed to her whether she remained "confidential" or not.

The entire Rule 27 process was supposed to take 84 days. It lasted 10 months. Defendant held two public hearings regarding this investigation, and although Ms. Baumgart's original findings redacted Ms. Hanson's name, they referred to her as Sen. Gelser's staff person, again outing her publicly as the only staff member in the office during this time. Ms. Baumgart asked for at least one extension to finalize her findings, as did Jackie Sandmeyer, the Legislative Equity Officer, and Defendant moved its investigation timeline for their requests. However, when Ms. Hanson asked for an extension to the first public hearing because she was ill with suspected COVID-19 and to accommodate her disabilities, the Defendant denied the request. On July 15, 2020, Ms. Baumgart testified publicly about Ms. Hanson accessing therapy and needing a "mental health day," alleging that leave for mental health is not protected. On October 7, 2020, Ms. Baumgart changed her testimony, stating that Ms. Hanson's request for a "mental health day" was protected by law.

Ms. Baumgart recommended to Sen. Gelser that she end the working relationship with Ms. Hanson. The day of the second hearing on October 7, 2020, Defendant terminated Ms. Hanson's employment, which Sen. Gelser explained by saying:

> A key element of a successful relationship with a Chief of Staff is trust. Unfortunately, I lost trust in your ability to serve my office due to repeated errors, failure to accurately record leave time and discovering the actions you took to delete emails from my sent box after you forwarded them from my Outlook account to your personal email account without my knowledge or consent.

Defendant has also argued later that Ms. Hanson was terminated because she stored personal documents on her work computer and because she told Sen. Gelser that the work environment was toxic and abusive. Sen. Gelser also later testified in deposition that she terminated Ms. Hanson because Ms. Baumgart told her that Ms. Hanson had not been genuine in a Christmas card and others told her Ms. Hanson had given all of her texts to the news and had said she would destroy the senator's career. Ms. Hanson disputes these statements, but a reasonable person could conclude that because Ms. Hanson was the one restricted from work under the Rule 27 process, not Sen. Gelser, it created an atmosphere of criticism and mistrust about Ms. Hanson that led to her termination. Ms. Hanson was not in the workplace to defend herself or remind her coworkers and the senator that she cared about her work and wanted to contribute.

After her termination, she was hired for a limited-duration job for the Oregon Employment Department. That job lasted from December 17, 2020 through August 31, 2021. After that position ended, she struggled to find work.

In December 2022, Defendant hired Ms. Hanson again, this time working for Representative Khanh Pham. The legislature was already on notice regarding Ms. Hanson's disabilities, but she was open with her supervisors and asked for accommodations right away, including that she needed clear, written assignments and description of her role to accommodate her ADHD. Ms. Hanson met with Rep. Pham's chief of staff, Robin Ye, on January 3, 2023, to begin work assignments, and she started work formally on January 4. Ms. Hanson began filling out formal paperwork to request accommodations on January 10, 2023, but delayed turning it in because Chief of Staff Ye asked for "grace January", which he explained meant that he would be more able to talk about accommodations in February. Defendant terminated Ms. Hanson's

Page 8 - **PLAINTIFF'S TRIAL MEMORANDUM**   Cambreleng & Marton LLC
3518 S Corbett Ave
Portland, Oregon 97239
(503) 477-4899

employment on January 25, 2023, however, without engaging in an interactive process to accommodate Ms. Hanson for alleged errors related to her disability.

## LEGAL ISSUES

### I. Disability Discrimination – ADA, Rehabilitation Act, and ORS 659A.112

Plaintiff has brought claims under the Americans with Disabilities Act (ADA, 42 U.S.C. § 12111, *et seq.*), Rehabilitation Act (29 U.S.C. § 701, *et seq.*), and Oregon disability discrimination law (ORS 659A.103, *et seq.*). Specifically, plaintiff alleges that on January 6, 2020, defendant suspended her and restricted her from the workplace, on October 7, 2020, it terminated her, and then on January 25, 2023, it terminated her a second time because of her disabilities. She also alleges that defendant failed to accommodate her disabilities, leading to her terminations on October 7, 2020, and January 25, 2023.

The ADA and Oregon law prohibit covered employers from discriminating against "terms, conditions, and privileges" of employment, including by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee …". 42 U.S.C. § 12112(a), (b)(5); ORS 659A.112(1), (2)(a) and (e). The Rehabilitation Act, likewise, prohibits discrimination based on disability in any program or activity receiving federal funding. 29 U.S.C. § 794(a). Both the Rehabilitation Act and Oregon law are interpreted consistently, to the extent possible, with the ADA to determine whether a violation occurred. 29 U.S.C. § 794(d); ORS 659A.139(A).

In order to prove she was discriminated against based on her disability, plaintiff must prove "(1) that she was disabled under the ADA; (2) that she was a qualified individual with a disability; and (3) that she was discriminated against by her employer because of that disability." *Dunlap v. Liberty Natural Products, Inc.*, 878 F.3d 794, 798-799 (9th Cir. 2017).

Federal courts follow *McDonnell Douglas* burden shifting for both federal claims and pendant state claims. *Snead v. Metropolitan Property & Cas. Ins. Co.*, 237 F.3d 1080, 1091 (9th

Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802). Under that framework, an employee must first establish a *prima facie* case of discrimination. *Id.* Then, the employer must articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* Finally, if the employer has articulated a legitimate, non-discriminatory reason, the employee must show the proffered reason is pretextual by showing indirect discriminatory motive or that the reason is not credible. *Id.*

The Ninth Circuit follows "but-for" causation regarding disability discrimination. *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir. 2019). Conduct, even misconduct, resulting from a disability is considered to be part of the disability, rather than a separate basis for termination. *Dark v. Curry County*, 451 F.3d 1078, 1084 (9th Cir 2006). A causal link can also be inferred from circumstantial evidence, such as temporal proximity between a protected activity and the adverse action. *Dawson*, 630 F.3d at 936 (citing *Jordan v. Clark*, 847 F2d 1368, 1376 (9th Cir. 1988)). Specific and substantial circumstantial evidence is enough to support a disability claim. *Dark* at 1188.

Defendant concedes that Ms. Hanson at least has the disability of PTSD. Ms. Hanson also formally notified Defendant that she had depression and anxiety in her January 20, 2021, medical certification for FMLA/OFLA. Ms. Hanson notified Sen. Gelser by text of her ADHD, and Jessica Knieling discussed that diagnosis with Sen. Gelser.

Sen. Gelser and Rep. Pham have both described Ms. Hanon as qualified for the essential functions of her job, consistently describing her as smart, a good writer, and highly qualified.

The parties dispute, however, whether Ms. Hanson was suspended and terminated because of her disability, including failure to accommodate her disability, or whether defendant had a legitimate, non-discriminatory reason to terminate Ms. Hanson. Ms. Hanson contends that Defendant's HR Director, Jessica Knieling, had animosity toward Ms. Hanson based on her disabilities, describing her as "crazy" to other staff members. Ms. Knieling was involved in both of Ms. Hanson's terminations, and Ms. Hanson believes that without this factor, she likely would

Page 10 - **PLAINTIFF'S TRIAL MEMORANDUM**　　　　　　　　　　Cambreleng & Marton LLC
3518 S Corbett Ave
Portland, Oregon 97239
(503) 477-4899

not have been terminated. Ms. Hanson further contends, regarding her employment in Sen. Gelser's office, that she would not have been suspended or terminated if she had not struggled with Sen. Gelser's instructions because of her disability of ADHD and/or required time off because of her anxiety, depression, and PTSD. Likewise, Ms. Hanson believes that Rep. Pham's office perceived her negatively because she disclosed her disabilities, as reflected in communications from Rep. Pham's Chief of Staff, which contributed to her termination.

Defendant's termination letter from October 7, 2020, came from Sen. Gelser, who explained the termination decision, saying, "Unfortunately, I lost trust in your ability to serve my office due to repeated errors, failure to accurately record leave time and discovering the actions you took to delete emails from my sent box after you forwarded them from my Outlook account to your personal email account without my knowledge or consent." Sen. Gelser shifted that explanation somewhat in deposition, explaining that she did not intend to terminate Ms. Hanson on January 6, 2020, after which Ms. Hanson did no work for the senator. Any alleged errors or leave time issues happened before that date. Likewise, defendant's email records show that Ms. Hanson actually forwarded the referenced emails to her legislative account, in which they continued to be stored. Ms. Hanson acknowledges that she deleted the forwards from Sen. Gelser's sent box in order to clean it up at the senator's instruction, but the records continued to be maintained with the legislature.

After the termination letter, Defendant has also argued that Ms. Hanson was terminated for the following reasons: (1) using state computer resources for personal reasons; (2) telling Sen. Gelser that she created a toxic work environment, and (3) statements made by other people, including Brenda Baumgart telling Sen. Gelser that Ms. Hanson gave Sen. Gelser a Christmas card that was not genuine, a staffer saying that Ms. Hanson said she would destroy Sen. Gelser's career, and someone telling her that Ms. Hanson had given all of their text messages to the news.

Ultimately, though, Sen. Gelser did not terminated Ms. Hanson after discovering any of these allegations, but instead waited until defendant's Rule 27 hearings finished.

Sen. Gelser has most importantly testified that defendant terminated Ms. Hanson's employment because Brenda Baumgart recommended it. Defendant suspended, investigated, and terminated Ms. Hanson because she needed a protected day off because of her disabilities and told Dir. Knieling she was concerned Sen. Gelser retaliated against her for that. Defendant's stated reasons for termination all either were known to Sen. Gelser by January 6, 2020, when she did not intend to terminate Ms. Hanson, were actions taken at Sen. Gelser's request, or directly speak to defendant's discriminatory animus toward Ms. Hanson.

Regarding the January 25, 2023, termination, defendant points to two assignments it believes Ms. Hanson worked on when Rep. Pham's office did not want her to work as the reason for her termination. Defendant argues that it provided written assignments, but the assignments it has provided start only a week before Ms. Hanson was terminated. Ms. Hanson requested accommodations, including that she receive her role description and assignments in writing, and Chief of Staff Ye told her he needed grace in January before working with her on them. Ms. Hanson taking action on two assignments does not seem to be a genuine reason for discipline, let alone termination. Additionally, however, plaintiff's requested accommodation of clear written roles and assignments would very likely have resolved any issue with misunderstanding about assignments.

A reasonable juror could conclude that Ms. Hanson was suspended and terminated twice because of disability discrimination or because of failure to accommodate Ms. Hanson's disabilities.

## II.     Whistleblower Retaliation—ORS 659A.199 and ORS 659A.203

Plaintiff has brought claims for whistleblower retaliation under ORS 659A.199 and ORS 659A.203. These claims arise under the same facts as the disability discrimination claims related to her employment in Sen. Gelser's office.

Page 12 - **PLAINTIFF'S TRIAL MEMORANDUM**                    Cambreleng & Marton LLC
3518 S Corbett Ave
Portland, Oregon 97239
(503) 477-4899

ORS 659A.199 requires plaintiff to prove that she (1) reported information that she believed to be evidence of a violation of state or federal law, rule, or regulation; (2) the report was made in good faith; and (3) defendant discharged, demoted, suspended, or discriminated or retaliated against plaintiff with regard to any term, condition, or privilege of employment because of the report. A report may be made to someone internal to the employer. *Brunozzi v. Cable Communications, Inc.*, 851 F.3d. 990, 999 (9th Cir. 2017).

ORS 659A.203 is similar, but requires plaintiff to prove (1) that she disclosed information she believed was evidence that a public employer (a) violated a federal or state law, rule, or regulation; (b) engaged in mismanagement, gross waste of funds, or abuse of authority; or (c) took an action resulting in substantial and specific danger to public health; (2) defendant took or threatened to take disciplinary action against the plaintiff because of the disclosure; and (3) plaintiff was harmed as a result.

While the ORS 659A.199 claim requires a plaintiff to prove that she had a good faith belief that the evidence she reported showed violation of law, rule, or regulation, the ORS 659A.203 claim requires plaintiff to prove she had an "objectively reasonable belief" that the evidence she disclosed showed a violation. *Love v. Polk County Fire Dist.*, 209 Or. App. 474, 488-91 (2006).

Oregon law follows the "substantial factor" causation standard for whistleblower claims. *Larmanger v. Kaiser Foundation Health Plan of the Northwest*, 895 F. Supp.2d 1033, 1049 (D. Or. 2012) (citing *Estes v. Lewis and Clark College,* 152 Or. App. 372, 381 (1998).

These claims are limited to Ms. Hanson's employment in Sen. Gelser's office. On January 2, 2020, Ms. Hanson told Dir. Knieling by email that she believed Sen. Gelser's actions were FMLA/OFLA retaliation. That email initiated the Rule 27 process under which she was suspended, investigated and terminated. While defendant has argued that it has non-retaliatory reasons for termination, the majority of the alleged reasons are clearly pretextual because they were known before January 6, 2020, when Sen. Gelser did not intend to terminate Ms. Hanson. Of the reasons

that were not known before January 6, 2020, one is essentially that Brenda Baumgart, defendant's attorney, told her to terminate Ms. Hanson. Another is that Ms. Hanson gave information to the news, which speaks directly to the reporting or disclosing elements of the whistleblower claims. A reasonable juror could find that defendant retaliated against Ms. Hanson by suspending and terminating her because she reported or disclosed evidence of violations.

### III. OFLA Interference and Discrimination—ORS 659A.183

Finally, plaintiff has brought a claim under the Oregon Family Leave Act (OFLA), alleging that defendant interfered with her attempt to take medical leave in December 2019 and discriminated against her when she told Dir. Knieling about the interference.

OFLA is construed to the extent possible in a manner consistent with the federal Family and Medical Leave Act of 1993. ORS 659A.186(2); *Kelly v. Boeing Co.*, 400 F.Supp.3d 1093, 1110-1111 (D. Or. 2019). This Court has explained:

> The FMLA creates two interrelated substantive rights for employees. First, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave. To vindicate those rights, the courts have recognized two theories of recovery: the retaliation or discrimination theory, and the entitlement or interference theory. Discrimination or retaliation claims arise from violations of the provision of the FMLA that makes it unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter. Interference claims, on the other hand, arise from employers' attempts to interfere with, restrain, or deny the exercise of or the attempt to exercise the substantive rights guaranteed by the FMLA.

(internal citations omitted) (citing *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001); *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011).

Oregon law follows the "substantial factor" test for causation for employment violations. *Larmanger v. Kaiser Foundation Health Plan of the Northwest*, 895 F. Supp.2d 1033, 1049 (D.

Or. 2012) (citing *Estes v. Lewis and Clark College,* 152 Or. App. 372, 381 (1998). Some circuits have applied the "but for" standard for causation to FMLA claims, but we have not found any cases indicating that the Ninth Circuit has done so. *Fry v. Rand Construction Corp.*, 964 F.3d 239 (4th Cir. 2020); *Lapham v. Walgreen Co.*, 88 F.4th 879 (11th Cir. 2023). Others have applied a "mixed motive" or "motivating factor" standard. *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158 (2nd Cir. 2017); *Egan v. Delaware River Port Authority*, 851 F.3d 263 (3d Cir. 2017); *Stein v. Atlas Industries, Inc.*, 730 Fed.Appx. 313 (6th Cir. 2018). We believe the appropriate standard for an OFLA claim is the "substantial factor" test under Oregon law.

Like the whistleblower claims, Ms. Hanson's OFLA claim is limited to the employment period in which Ms. Hanson was assigned to work for Sen. Gelser. Ms. Hanson "urgently" needed medical leave and reported that to Sen. Gelser on December 17, 2019. Defendant interfered with Ms. Hanson's leave when Sen. Gelser told Ms. Hanson leave would not be convenient that week and continued to ask her to complete work before she went on leave. On January 2, 2020, Ms. Hanson told Dir. Knieling she believed she may be experiencing FMLA/OFLA retaliation, and because of that Defendant suspended Ms. Hanson from work and initiated its investigation, which resulted in Ms. Hanson's termination on October 7, 2020. A reasonable juror could find that defendant interfered with and discriminated against Ms. Hanson based on her attempt to take medical leave, inquire about her rights under OFLA, and exercise those rights.

## DAMAGES

As compensation for the harm defendant's actions have imposed on plaintiff, she seeks equitable relief and economic damages, including wage loss and medical expenses; compensation for her stress and emotional and mental harm; pre- and post-judgment interest; prevailing party costs; reasonable costs and attorney fees; and any other relief this Court deems just and equitable.

## Conclusion

The evidence supports a finding that defendant suspended, trespassed, and terminated Ms. Hanson in 2020 because Ms. Hanson attempted to take a protected leave day for her disabilities and then told Dir. Knieling that she believed Sen. Gelser had retaliated against her because of it. The evidence supports a finding that defendant again terminated Ms. Hanson in 2023 because of negative perceptions of Ms. Hanson based on her disabilities and defendant's failure to accommodate them. Each of these actions violate the ADA, Rehabilitation Act, and Oregon law as described above.

Dated this 11th day of April, 2024.

Respectfully submitted,

 /s Rebecca Cambreleng
Rebecca Cambreleng, OSB No. 133209
Rebecca@employmentlaw-nw.com
CAMBRELENG & MARTON LLC
3518 S. Corbett Avenue
Portland, OR 97239
*Of Attorneys for Plaintiff*

Meredith Holley(she/her), OSB No. 125647
Meredith@ErisResolution.com
Law Office of Meredith Holley
207 E 5th Avenue, Suite 254
Eugene, OR 97401
Phone: (458) 221-2671
Fax: (833) 352-3615
  *Of Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I certify that on April 11, 2024, I served the foregoing **PLAINTIFF'S TRIAL MEMORANDUM** upon the parties hereto via electronic means through the Court's Case Management/Electronic Case File system and via electronic mail:

>Meredith Holley, OSB No. 125647
>Meredith@erisresolution.com
>Eris Conflict Resolution
>207 E 5th Avenue, Suite 254
>Eugene, Oregon 97401
>*Of Attorneys for Plaintiff*
>
>Marc Abrams, OSB No. 890149
>Marc.abrams@doj.state.or.us
>Allie Boyd, OSB No. 163478
>Allie.m.boyd@doj.state.or.us
>Oregon Department of Justice
>100 SW Market Street
>Portland, Oregon 97201
>*Attorneys for Defendant*

CAMBRELENG & MARTON LLC

By: s/ Maxwell Joyner
Max Joyner, Paralegal